## LOCKHEED CORP. ET AL. *v.* SPINK

No. 95–809.   Argued April 22, 1996—Decided June 10, 1996

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, and GINSBURG, JJ., joined, and in which SOUTER and BREYER, JJ., joined as to all but Part III–B. BREYER, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, J., joined, *post*, p. 898.

*Gordon E. Kirscher* argued the cause for petitioners. With him on the briefs were *David E. Gordon, Kenneth E. Johnson, Kenneth S. Geller*, and *Ralph A. Hurvitz.*

*Richard P. Bress* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Argrett, Edwin S. Kneedler, Kenneth L. Greene, J. Davitt McAteer, Allen H. Feldman,* and *Edward D. Sieger.*

*Theresa M. Traber* argued the cause for respondent. With her on the brief was *Bert Voorhees.** 

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we decide whether the payment of benefits pursuant to an early retirement program conditioned on the participants' release of employment-related claims constitutes a prohibited transaction under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.* We also determine whether the 1986 amendments to ERISA and the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.,* forbidding age-based discrimination in pension plans apply retroactively.

I

Respondent Paul Spink was employed by petitioner Lockheed Corporation from 1939 until 1950, when he left to work

---

*Briefs of *amici curiae* urging reversal were filed for the ERISA Industry Committee by *Michael E. Horne* and *John M. Vine;* for the Equal Employment Advisory Council by *Douglas S. McDowell* and *Ellen Duffy McKay;* and for the New England Legal Foundation by *William J. Kilberg, Peter H. Turza, Paul Blankenstein, Mark Snyderman,* and *Stephen S. Ostrach.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of Retired Persons by *Cathy Ventrell-Monsees* and *Mary Ellen Signorille;* for the Engineers and Scientists Guild, Lockheed Section, by *Stuart Libicki;* and for the National Employment Lawyers Association by *Stephen R. Bruce, Ronald Dean,* and *Jeffrey Lewis.*

Briefs of *amici curiae* were filed for the American Academy of Actuaries et al. by *Lauren M. Bloom;* and for the Chamber of Commerce of the United States by *Hollis T. Hurd, Stephen A. Bokat,* and *Robin S. Conrad.*

for one of Lockheed's competitors. In 1979, Lockheed persuaded Spink to return. Spink was 61 years old when he resumed employment with Lockheed. At that time, the terms of the Lockheed Retirement Plan for Certain Salaried Individuals (Plan), a defined benefit plan, excluded from participation employees who were over the age of 60 when hired. This was expressly permitted by ERISA. See 29 U. S. C. § 1052(a)(2)(B) (1982 ed.).

Congress subsequently passed the Omnibus Budget Reconciliation Act of 1986 (OBRA), Pub. L. 99–509, 100 Stat. 1874. Section 9203(a)(1) of OBRA, 100 Stat. 1979, repealed the age-based exclusion provision of ERISA, and the statute now flatly mandates that "[n]o pension plan may exclude from participation (on the basis of age) employees who have attained a specified age." 29 U. S. C. § 1052(a)(2). Sections 9201 and 9202 of OBRA, 100 Stat. 1973–1978, amended ERISA and the ADEA to prohibit age-based cessations of benefit accruals and age-based reductions in benefit accrual rates. See 29 U. S. C. §§ 1054(b)(1)(H)(i), 623(i)(1).

In an effort to comply with these new laws, Lockheed ceased its prior practice of age-based exclusion from the Plan, effective December 25, 1988. As of that date, all employees, including Spink, who had previously been ineligible to participate in the Plan due to their age at the time of hiring became members of the Plan. Lockheed made clear, however, that it would not credit those employees for years of service rendered before they became members.

When later faced with the need to streamline its operations, Lockheed amended the Plan to provide financial incentives for certain employees to retire early. Lockheed established two programs, both of which offered increased pension benefits to employees who would retire early, payable out of the Plan's surplus assets. Both programs required as a condition of the receipt of benefits that participants release any employment-related claims they might have against Lockheed. Though Spink was eligible for one of the pro-

grams, he declined to participate because he did not wish to waive any ADEA or ERISA claims. He then retired, without earning any extra benefits for doing so.

Spink brought this suit, in his individual capacity and on behalf of others similarly situated, against Lockheed and several of its directors and officers. Among other things, the complaint alleged that Lockheed and the members of the board of directors violated ERISA's duty of care and prohibited transaction provisions, 29 U. S. C. §§ 1104(a), 1106(a), by amending the Plan to create the retirement programs. Relatedly, the complaint alleged that the members of Lockheed's Retirement Committee, who implemented the Plan as amended by the board, violated those same parts of ERISA. The complaint also asserted that the OBRA amendments to ERISA and the ADEA required Lockheed to count Spink's pre-1988 service years toward his accrued pension benefits. For these alleged ERISA violations, Spink sought monetary, declaratory, and injunctive relief pursuant to §§ 502(a)(2) and (3) of ERISA's civil enforcement provisions, 29 U. S. C. §§ 1132(a)(2), (3). Lockheed moved to dismiss the complaint for failure to state a claim, and the District Court granted the motion.

The Court of Appeals for the Ninth Circuit reversed in relevant part. 60 F. 3d 616 (1995). The Court of Appeals held that the amendments to the Plan were unlawful under ERISA § 406(a)(1)(D), 29 U. S. C. § 1106(a)(1)(D), which prohibits a fiduciary from causing a plan to engage in a transaction that transfers plan assets to a party in interest or involves the use of plan assets for the benefit of a party in interest. The court reasoned that because the amendments offered increased benefits in exchange for a release of employment claims, they constituted a use of Plan assets to "purchase" a significant benefit for Lockheed. 60 F. 3d, at 624. Though the court found a violation of § 406(a)(1)(D), it decided that there was no need to address Lockheed's status as a fiduciary. *Id.*, at 623, n. 5. In addition, the Court of

Appeals agreed with Spink that Lockheed had violated the OBRA amendments by refusing to include Spink's service years prior to 1988 in determining his benefits. In so holding, the court found that the OBRA amendments apply retroactively. See *id.*, at 620, n. 1. We issued a writ of certiorari, 516 U. S. 1087 (1996), and now reverse.

## II

Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 91 (1983); *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 511 (1981). ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits. As we said in *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359 (1980), when Congress enacted ERISA it "wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit— he actually will receive it." *Id.*, at 375. Accordingly, ERISA tries to "make as certain as possible that pension fund assets [will] be adequate" to meet expected benefits payments. *Ibid.*

To increase the chances that employers will be able to honor their benefits commitments—that is, to guard against the possibility of bankrupt pension funds—Congress incorporated several key measures into ERISA. Section 302 of ERISA sets minimum annual funding levels for all covered plans, see 29 U. S. C. §§ 1082(a), 1082(b), and creates tax liens in favor of such plans when those funding levels are not met, see § 1082(f). Sections 404 and 409 of ERISA impose respectively a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries. See §§ 1104(a), 1109(a). Fi-

nally, § 406 of ERISA prohibits fiduciaries from involving the plan and its assets in certain kinds of business deals. See § 1106. It is this last feature of ERISA that is at issue today.

Congress enacted § 406 "to bar categorically a transaction that [is] likely to injure the pension plan." *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 160 (1993). That section mandates, in relevant part, that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U. S. C. § 1106(a)(1)(D).[1] The question here is whether this provision of ERISA prevents an employer from conditioning the receipt of early retirement benefits upon the participants' waiver of employment claims. For the following reasons, we hold that it does not.

### III

Section 406(a)(1) regulates the conduct of plan fiduciaries, placing certain transactions outside the scope of their lawful authority. When a fiduciary violates the rules set forth in § 406(a)(1), § 409 of ERISA renders him personally liable for any losses incurred by the plan, any ill-gotten profits, and other equitable and remedial relief deemed appropriate by the court. See 29 U. S. C. § 1109(a). But in order to sustain an alleged transgression of § 406(a), a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction.[2] Unless a plaintiff can make that

---

[1] Section 408 enumerates specific exceptions to the prohibitions in § 406. See 29 U. S. C. § 1108(b). Lockheed does not argue that any of these exceptions pertain to this case.

[2] ERISA § 3(21)(A) provides: "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or

showing, there can be no violation of § 406(a)(1) to warrant relief under the enforcement provisions. Cf. *Peacock* v. *Thomas,* 516 U. S. 349, 353 (1996) ("Section 502(a)(3) 'does not, after all, authorize "appropriate equitable relief" *at large,* but only "appropriate equitable relief" for the purpose of "redress[ing any] violations or . . . enforc[ing] any provisions" of ERISA'") (quoting *Mertens* v. *Hewitt Associates,* 508 U. S. 248, 253 (1993)). The Court of Appeals erred by not asking whether fiduciary status existed in this case before it found a violation of § 406(a)(1)(D).[3]

A

We first address the allegation in Spink's complaint that Lockheed and the board of directors breached their fiduciary

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U. S. C. § 1002(21)(A).

[3] Instead of pursuing this inquiry, the Court of Appeals found that Lockheed was a "party in interest" under § 3(14)(C), and asserted that "a party in interest who benefitted from an impermissible transaction can be held liable under ERISA." 60 F. 3d 616, 623 (CA9 1995). For that same proposition, several Courts of Appeals have relied on statements in *Mertens* v. *Hewitt Associates,* 508 U. S. 248 (1993), that "ERISA contains various provisions that can be read as imposing obligations upon nonfiduciaries," *id.,* at 253–254; see also *id.,* at 254, n. 4 (citing § 406(a)), and that "[p]rofessional service providers . . . must disgorge assets and profits obtained through participation as parties-in-interest in transactions prohibited by § 406," *id.,* at 262. See, *e. g., Reich* v. *Stangl,* 73 F. 3d 1027, 1031–1032 (CA10 1996), cert. pending, No. 95–1631; *Landwehr* v. *DuPree,* 72 F. 3d 726, 733–734 (CA9 1995); *Reich* v. *Compton,* 57 F. 3d 270, 285 (CA3 1995). Insofar as they apply to § 406(a), these statements in *Mertens* (which were in any event dicta, since § 406(a) was not at issue) suggest liability for parties in interest only when a violation of § 406(a) has been established— which, as we have discussed, requires a showing that a fiduciary caused the plan to engage in the transaction in question. The Court of Appeals thus was not necessarily wrong in saying that "a party in interest who benefitted from an *impermissible* transaction can be held liable under ERISA" (emphasis added); but the only transactions rendered impermissible by § 406(a) are transactions caused by fiduciaries.

duties when they adopted the amendments establishing the early retirement programs. Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans in *Curtiss-Wright Corp.* v. *Schoonejongen,* 514 U. S. 73 (1995), "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Id.,* at 78 (citing *Adams* v. *Avondale Industries, Inc.,* 905 F. 2d 943, 947 (CA6 1990)). When employers undertake those actions, they do not act as fiduciaries, 514 U. S., at 78, but are analogous to the settlors of a trust, see *Johnson* v. *Georgia-Pacific Corp.,* 19 F. 3d 1184, 1188 (CA7 1994).

This rule is rooted in the text of ERISA's definition of fiduciary. See 29 U. S. C. § 1002(21)(A) (quoted n. 2, *supra*). As the Second Circuit has observed, "only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration," does a person become a fiduciary under § 3(21)(A). *Siskind* v. *Sperry Retirement Program, Unisys,* 47 F. 3d 498, 505 (1995). "[B]ecause [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review." *Ibid.* We recently recognized this very point, noting that "it may be true that amending or terminating a plan . . . cannot be an act of plan 'management' or 'administration.'" *Varity Corp.* v. *Howe,* 516 U. S. 489, 505 (1996). As noted above, we in fact said as much in *Curtiss-Wright,* see 514 U. S., at 78, at least with respect to welfare benefit plans.

We see no reason why the rule of *Curtiss-Wright* should not be extended to pension benefit plans. Indeed, there are compelling reasons to apply the same rule to cases involving both kinds of plans, as most Courts of Appeals have

done.[4] The definition of fiduciary makes no distinction between persons exercising authority over welfare benefit plans and those exercising authority over pension plans. It speaks simply of a "fiduciary with respect to a plan," 29 U. S. C. § 1002(21)(A), and of "management" and "administration" of "such plan," *ibid.* And ERISA defines a "plan" as being either a welfare or pension plan, or both. See § 1002(3). Likewise, the fiduciary duty provisions of ERISA are phrased in general terms and apply with equal force to welfare and pension plans. See, *e. g.,* § 1104(a) (specifying duties of a "fiduciary . . . with respect to a plan"). See also *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S., at 91 (ERISA "sets various uniform standards, including rules concerning . . . fiduciary responsibility, for both pension and welfare plans"). Given ERISA's definition of fiduciary and the applicability of the duties that attend that status, we think that the rules regarding fiduciary capacity—including the settlor-fiduciary distinction—should apply to pension and welfare plans alike.

Lockheed acted not as a fiduciary but as a settlor when it amended the terms of the Plan to include the retirement programs. Thus, § 406(a)'s requirement of fiduciary status is not met. While other portions of ERISA govern plan amendments, see, *e. g.,* 29 U. S. C. § 1054(g) (amendment generally may not decrease accrued benefits); § 1085b (if adoption of an amendment results in underfunding of a defined benefit plan, the sponsor must post security for the amount of the deficiency), the act of amending a pension plan does not trigger ERISA's fiduciary provisions.

---

[4] See, *e. g., Siskind* v. *Sperry Retirement Program, Unisys,* 47 F. 3d 498, 505 (CA2 1995); *Averhart* v. *US WEST Management Pension Plan,* 46 F. 3d 1480, 1488 (CA10 1994); *Fletcher* v. *Kroger Co.,* 942 F. 2d 1137, 1139–1140 (CA7 1991); *Hozier* v. *Midwest Fasteners, Inc.,* 908 F. 2d 1155, 1160–1162 (CA3 1990) (listing cases); *Sutton* v. *Weirton Steel Div. of Nat. Steel Corp.,* 724 F. 2d 406, 411 (CA4 1983), cert. denied, 467 U. S. 1205 (1984).

## B

Spink also alleged that the members of Lockheed's Retirement Committee who implemented the amended Plan violated § 406(a)(1)(D). As with the question whether Lockheed and the board members can be held liable under ERISA's fiduciary rules, the Court of Appeals erred in holding that the Retirement Committee members violated the prohibited transaction section of ERISA without making the requisite finding of fiduciary status. It is not necessary for us to decide the question whether the Retirement Committee members acted as fiduciaries when they paid out benefits according to the terms of the amended Plan, however, because we do not think that they engaged in any conduct prohibited by § 406(a)(1)(D).

The "transaction" in which fiduciaries may not cause a plan to engage is one that "constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U. S. C. § 1106(a)(1)(D). Spink reads § 406(a)(1)(D) to apply in cases where the benefit received by the party in interest—in this case, the employer—is not merely a "natural inciden[t] of the administration of pension plans." Brief for Respondent 10. Lockheed, on the other hand, maintains that a plan administrator's payment of benefits to plan participants and beneficiaries pursuant to the terms of an otherwise lawful plan[5] is wholly outside the scope of § 406(a)(1)(D). See Reply Brief for Petitioners 10. We agree with Lockheed.

Section 406(a)(1)(D) does not in direct terms include the payment of benefits by a plan administrator. And the surrounding provisions suggest that the payment of benefits is

---

[5] As Lockheed notes, see Brief for Petitioners 13; Reply Brief for Petitioners 7, n. 4, there is no claim in this case that the amendments resulted in any violation of the participation, funding, or vesting requirements of ERISA. See 29 U. S. C. §§ 1051–1061 (participation and vesting); §§ 1081–1086 (funding).

in fact not a "transaction" in the sense that Congress used that term in §406(a). Section 406(a) prohibits fiduciaries from engaging the plan in the "sale," "exchange," or "leasing" of property, 29 U. S. C. §1106(a)(1)(A); the "lending of money" or "extension of credit," §1106(a)(1)(B); the "furnishing of goods, services, or facilities," §1106(a)(1)(C); and the "acquisition . . . of any employer security or employer real property," §1106(a)(1)(E), with a party in interest. See also §1108(b) (listing similar types of "transactions"). These are commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length. See *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S., at 160. What the "transactions" identified in §406(a) thus have in common is that they generally involve uses of plan assets that are potentially harmful to the plan. Cf. *id.*, at 160–161 (reasoning that a transfer of unencumbered property to the plan by the employer for the purpose of applying it toward the employer's funding obligation fell within §406(a)(1)'s companion tax provision, 26 U. S. C. §4975, because it could "jeopardize the ability of the plan to pay promised benefits"). The payment of benefits conditioned on performance by plan participants cannot reasonably be said to share that characteristic.

According to Spink and the Court of Appeals, however, Lockheed's early retirement programs were prohibited transactions within the meaning of §406(a)(1)(D) because the required release of employment-related claims by participants created a "significant benefit" for Lockheed. 60 F. 3d, at 624. Spink concedes, however, that among the "incidental" and thus legitimate benefits that a plan sponsor may receive from the operation of a pension plan are attracting and retaining employees, paying deferred compensation, settling or avoiding strikes, providing increased compensation without increasing wages, increasing employee turnover, and reducing the likelihood of lawsuits by encouraging employees

who would otherwise have been laid off to depart voluntarily. Brief for Respondent 11.

We do not see how obtaining waivers of employment-related claims can meaningfully be distinguished from these admittedly permissible objectives. Each involves, at bottom, a *quid pro quo* between the plan sponsor and the participant: that is, the employer promises to pay increased benefits in exchange for the performance of some condition by the employee. By Spink's admission, the employer can ask the employee to continue to work for the employer, to cross a picket line, or to retire early. The execution of a release of claims against the employer is functionally no different; like these other conditions, it is an act that the employee performs for the employer in return for benefits. Certainly, there is no basis in § 406(a)(1)(D) for distinguishing a valid from an invalid *quid pro quo.* Section 406(a)(1)(D) simply does not address what an employer can and cannot ask an employee to do in return for benefits. See generally *Alessi v. Raybestos-Manhattan, Inc.,* 451 U. S., at 511 (ERISA "leaves th[e] question" of the content of benefits "to the private parties creating the plan. . . . [T]he private parties, not the Government, control the level of benefits").[6] Furthermore, if an employer can avoid litigation that might result from laying off an employee by enticing him to retire early, as Spink concedes, it stands to reason that the employer can also protect itself from suits arising out of

---

[6] Indeed, *federal law expressly approves the use of early retirement incentives conditioned upon the release of claims.* The Older Workers Benefit Protection Act, Pub. L. 101–433, 104 Stat. 983 (1990), establishes requirements for the enforceability of employee waivers of ADEA claims made in exchange for early retirement benefits. See 29 U. S. C. § 626(f). Of course, the enforceability of a particular waiver under this and other applicable laws, including state law, is a separate issue from the question whether such an arrangement violates ERISA's prohibited transaction rules. But absent clearer indication than what we have in § 406(a)(1)(D), we would be reluctant to infer that ERISA bars conduct affirmatively sanctioned by other federal statutes.

that retirement by asking the employee to release any employment-related claims he may have.[7]

In short, whatever the precise boundaries of the prohibition in § 406(a)(1)(D), there is one use of plan assets that it cannot logically encompass: a *quid pro quo* between the employer and plan participants in which the plan pays out benefits to the participants pursuant to its terms. When § 406(a)(1)(D) is read in the context of the other prohibited transaction provisions, it becomes clear that the payment of benefits in exchange for the performance of some condition by the employee is not a "transaction" within the meaning of § 406(a)(1). A standard that allows some benefits agreements but not others, as Spink suggests, lacks a basis in § 406(a)(1)(D); it also would provide little guidance to lower courts and those who must comply with ERISA. We thus hold that the payment of benefits pursuant to an amended plan, regardless of what the plan requires of the employee in return for those benefits, does not constitute a prohibited transaction.[8]

---

[7] Spink's *amicus* the United States suggests that § 406(a)(1)(D) is not violated so long as the employer provides benefits as compensation for the employee's labor, not for other things such as a release of claims. See Brief for United States as *Amicus Curiae* 15–16. But the Government contradicts its own rule with the examples it gives of lawful plans. For instance, the Government recognizes that "[a]n employer may provide increased pension benefits as an incentive for early retirement." *Id.*, at 20. While retirement benefits themselves may be defined as deferred wages, an *increase* in retirement benefits as part of an early retirement plan does not compensate the employee so much for services rendered as for the distinct act of leaving the company sooner than planned. The standard offered by the Government is thus of little help in identifying transactions prohibited by § 406(a)(1)(D).

[8] If the benefits payment were merely a sham transaction, meant to disguise an otherwise unlawful transfer of assets to a party in interest, or involved a kickback scheme, that might present a different question from the one before us. Spink does not suggest that Lockheed's payment was a cover for an illegal scheme, only that payment of the benefits conditioned on the release was itself violative of § 406(a)(1)(D).

## IV

Finally, we address whether §§ 9201 and 9202(a) of OBRA, which amended respectively the ADEA and ERISA to prohibit age-based benefit accrual rules, apply retroactively.[9] Two Terms ago, we set forth the proper approach for determining the retroactive effect of a statute in *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994). We stated that "[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Id.*, at 280. Thus, we must determine whether Congress has plainly delineated the temporal scope of the OBRA amendments to ERISA and the ADEA.

Section 9204(a)(1) of OBRA, 100 Stat. 1979, expressly provides that "[t]he amendments made by sections 9201 and 9202 shall apply only with respect to plan years beginning on or after January 1, 1988, and only to employees who have 1 hour of service in any plan year to which such amendments apply." 29 U. S. C. § 623 note. This language compels the conclusion that the amendments are prospective. For plan years that began on or after January 1, 1988, age-based accrual rules are unlawful under the amendments; further, only employees who have one hour of service in such a plan year are entitled to the protection of the amendments. But for plan years prior to the effective date, employers cannot be held liable for using age-based accrual rules. Where, as here, the temporal effect of a statute is manifest on its face, "there is no need to resort to judicial default rules," *Land-*

---

[9] Section 9203(a)(1) of OBRA, amending ERISA to prevent the exclusion of employees of a certain age from plan participation, applies "only with respect to plan years beginning on or after January 1, 1988, and only with respect to service performed on or after such date." OBRA § 9204(b), 100 Stat. 1980. The Court of Appeals acknowledged that Lockheed fully complied with that amendment by admitting Spink as a member of the Plan as of December 25, 1988, the first day of Lockheed's 1988 plan year.

*graf* v. *USI Film Products, supra,* at 280, and inquiry is at an end.

Notwithstanding the clarity of §9204(a)(1), the Court of Appeals believed that the text of §§9201 and 9202(a) require retroactive application of the benefit accrual rules. To deny an employee credit for service years during which he was excluded from the plan based on age, even though that exclusion was lawful at the time, the Court of Appeals reasoned, is to reduce the rate of benefits accrual for that employee.[10] 60 F. 3d, at 620. When Congress includes a provision that specifically addresses the temporal effect of a statute, that provision trumps any general inferences that might be drawn from the substantive provisions of the statute. See generally *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 384 (1992); *Fourco Glass Co.* v. *Transmirra Products Corp.,* 353 U. S. 222, 228–229 (1957). Even if it were proper to disregard the express time limitations in §9204(a)(1) in favor of more general language, §§9201 and 9202(a) cannot bear the weight of the Court of Appeals' construction. A reduction in total benefits due is not the same thing as a reduction in the rate of benefit accrual; the former is the final outcome of the calculation, whereas the latter is one of the factors in the equation.

\*　　\*　　\*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[10] See 29 U. S. C. §1054(b)(1)(H)(i) (OBRA §9202(a)) (defined benefit plan violates ERISA's benefit accrual requirements "if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age"); §623(i)(1)(A) (OBRA §9201) (prohibiting employers from establishing or maintaining a defined benefit plan that "requires or permits . . . the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual").

JUSTICE BREYER, with whom JUSTICE SOUTER joins, concurring in part and dissenting in part.

I join the Court's opinion except for its conclusion in Part III–B that "the payment of benefits pursuant to an amended plan, regardless of what the plan requires of the employee in return for those benefits, does not constitute a prohibited transaction." *Ante*, at 895. The legal question addressed in Part III–B is a difficult one, which we need not here answer and which would benefit from further development in the lower courts, where interested parties who are experienced in these highly technical, important matters could present their views. Accordingly, I would follow the suggestion of the Solicitor General that the Court not reach the issue in this case.