Tommy J. ABBOTT, et al.,
Plaintiffs–Appellants,

v.

PIPEFITTERS LOCAL UNION NO. 522 HOSPITAL, MEDICAL, AND LIFE BENEFIT PLAN; Trustees of the Pipefitters Local Union No. 522 Hospital, Medical, and Life Benefit Plan; and Joseph Warren, in his official capacity as a trustee of the Pipefitters Local Union No. 522 Hospital, Medical, and Life Benefit Plan, Defendants–Appellees.

No. 95–5063.

United States Court of Appeals,
Sixth Circuit.

Argued May 20, 1996.

Decided Aug. 29, 1996.

Charles L. Berger (argued and briefed), Evansville, IN, for Tom Abbott, et al.

John D. Dyche (argued and briefed), Tachau, Maddox & Hovious, Louisville, KY, for Local 522 & 633 Plumbers Health & Welfare Benefit Plan, Local 522 & 633 Trustees of the Plumbers Health & Welfare Benefit Plan.

Before: RYAN and NORRIS, Circuit Judges; JOINER, District Judge.[*]

JOINER, District Judge.

Plaintiffs, 147 members of Pipefitters Local 633, appeal the judgment against them in this action brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. Plaintiffs claim that the trustees of the welfare benefit plan to which they belonged violated two provisions of ERISA by charging plaintiffs a contribution rate higher than that charged to plan members who belonged to Local 522. The district court concluded that the trustees permissibly could differentiate between the two locals in setting the contribution rates, and dismissed plaintiffs' claims. We affirm.

## I.

### A.

The essential facts are not in dispute. In 1955, Pipefitters Local 522, based in Louisville, Kentucky, established the Pipefitters Local No. 522 Hospital, Medical, and Life Benefit Plan (the "plan"). In 1970, members of Local 633, which is based in Owensboro, Kentucky, were permitted to join the plan as a group. The plan is a multi-employer, union-sponsored welfare benefit plan that pays scheduled medical, health, and life benefits on claims made by participants. The plan is funded primarily with contributions from the employers of plan participants. The amount of employer contributions is governed by the collective bargaining agreement entered into between the local and the association of employers for whom the local's members work, and is calculated as an hourly rate based on hours worked by each employee. If a participant does not work and thus does not earn employer contributions, he may make direct contributions to the plan to continue coverage. Prior to 1990, the contribution amount did not vary depending on the local to which the employee belonged; as of 1990, the hourly rate was $1.70.

In March 1990, the plan actuary reported an operational loss of $80,449 for the first three months of the 1990 plan year. Further investigation revealed that for the preceding 44–month period, the claims and expenses for Local 633 participants totalled $2,176,611, while contributions by or on behalf of these participants totalled only $1,232,702, resulting in a loss of $943,909. The contributions made by or on behalf of Local 522 participants, on the other hand, exceeded their claims by $337,432. The plan thus suffered a net operational loss of $606,477 for this 44–month period. The plan ultimately suffered a loss of $359,140 for the 1990 plan year.

The trustees conferred with counsel, and then voted unanimously to require that each local operate in the black. The trustees promptly communicated their decision to the participants, and informed them as well that a significant increase in the contribution level would be implemented soon. After receiving the actuary's calculations, the trustees sent a letter to participants, stating that in order for each local to be self-supporting, Local 633 participants would be charged $3.36 per

[*] The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

hour, and that Local 522 participants would be charged $1.90 per hour. The trustees further explained that if the participants did not pay the designated amounts, the schedule of benefits would be reduced to correspond with the amount paid per hour. Evidently treating the issue before them as one involving plan administration, the trustees did not formally amend the plan to institute the differentiated contribution rates. In response to the alternatives given to them, a majority of the Local 633 participants voted to obtain insurance from another source, and left the plan.

### Plan Structure and Provisions

The plan's definitional sections state that "union" means both Local 522 and Local 633. "Employee" and "eligible employee" are defined without reference to local affiliation. There are no provisions in the plan that authorize the trustees to differentiate between participants from the two locals in setting contribution rates, nor any provisions that prohibit differentiation between the two locals.

The permissible structure of a union-sponsored benefit plan such as the one involved in this case is governed by § 302(c)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5). As required by § 302(c)(5)(B), the plan is administered by a body of trustees, with employers and employees having equal representation. Local 633 joined the plan in 1970 with the understanding that the trustees of the plan would continue to be drawn from Local 522. The trust agreement states that the trustees are to be drawn from Local 522 and the employers for whom that local's members work, and that Local 633 is entitled to one alternate trustee (who serves on a temporary basis in the absence of a regular trustee). In 1990, the two employer trustees were members of the employers association in Louisville, and the two employee trustees were the business manager and senior business representative of Local 522.

The trustees' powers and duties are detailed in both the plan and the trust agreement. Article IX of the plan states that the trustees are named fiduciaries, and imposes on them the duty to "act solely in the interest of Employees, Dependents, Survivors and Beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable administrative expenses." (Section 9.01.) Article VIII of the plan governs amendments, and provides that the plan "may be amended in any respect at any time ... by a resolution adopted by a majority vote of the Trustees, effective as of the date set forth in the resolution[.]"[1] Article X states that "[a]ny rules, regulations, or procedures that may be necessary for the proper administration or functioning of this Plan that are not covered in this Plan or the Trust Agreement shall be promulgated and adopted by the Trustees."

The trust agreement grants broad powers to the trustees:

> To decide all questions or controversies arising in any manner or between any parties or persons in connection with the Health and Welfare Fund or the operation thereof, whether as to any claim for benefits made by any Employee, or any other person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or established by this instrument, or as to any writing, decision, instrument, or accounts in connection with the operation of the Health and Welfare Fund or otherwise. The decision of the Trustees shall be binding upon all persons dealing with the Health and Welfare Fund or claiming any benefits thereunder.

(Section 2.2.) Section 7.1 vests administration of the trust fund "wholly in the Trustees" and grants the trustees the power to "obtain and evaluate all statistical and actuarial data which may be reasonably required with respect to the administration of the Health and Welfare Plan" and to make such

---

1. Several limitations are set forth on the ability to amend, none of which is relevant to plaintiffs' claims. The plan may not be amended to change the requirements that the union and employers association have equal numbers of trustees; that there be an annual audit of the plan; and that no portion of the fund may be diverted to a use other than for the benefit of beneficiaries. These limitations derive from LMRA § 302(c)(5).

other rules and regulations as may be necessary for the administration of the Plan. Section 7.2(*l*) authorizes the trustees to "[p]repare, promulgate and issue rules and regulations pertaining to application for benefits of the Fund, eligibility requirements to participate in the same and types and kinds of benefits to be secured from proceeds of the Fund."

## B.

Plaintiffs filed suit in 1991 against the plan and its trustees, claiming that the trustees breached their fiduciary duties and improperly discriminated against them by charging them a higher contribution rate than that charged to members of Local 522. The case was submitted to the court on the basis of a stipulated record. In granting judgment in defendants' favor on the breach of fiduciary duty claim, the court relied on Sixth Circuit precedent holding that the trustees of a multi-employer welfare benefit plan do not act in a fiduciary capacity in amending the terms of a plan to protect the plan's financial solvency. The court dismissed the discrimination claim, concluding that plaintiffs had not demonstrated that defendants discriminated against them with respect to a right vested under ERISA.

## II.

Plaintiffs challenge the trustees' decision to set individual contribution rates for each local on two grounds. First, they claim that the trustees breached their fiduciary duty to the members of Local 633, in violation of ERISA § 404, 29 U.S.C. § 1104. Second, they claim that the trustees' decision constituted discrimination prohibited by ERISA § 409, 29 U.S.C. § 1109. We consider each argument in turn.

## A.

**Alleged Breach of Fiduciary Duty**

The plan at issue is an employee welfare benefit plan as defined under ERISA, 29 U.S.C. § 1002(1), as it provides medical, health and life benefits. As the Supreme Court recently cautioned, ERISA does not create a substantive entitlement to such benefits, and employers and plan sponsors are generally free to adopt, modify or terminate such plans "for any reason at any time." *Curtiss–Wright Corp. v. Schoonejongen,* —— U.S. ——, ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995). "Nor does ERISA establish minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." *Id.* Thus, plaintiffs had no vested right to continuation of the same schedule of benefits or the same contribution rates. Nonetheless, the trustees of the plan are fiduciaries under ERISA, and owe certain duties to the participants of the plan. The questions presented by this case are whether the specific decision at issue is subject to review for compliance with ERISA's fiduciary duties, and, if so, whether plaintiffs demonstrated that the trustees breached those duties.

A person is a "fiduciary," as that term is defined in ERISA § 3(21)(A), only when performing certain functions; e.g., "exercises any discretionary authority or discretionary control respecting management" of a plan. 29 U.S.C. § 1002(21)(A)(i). A fiduciary's functions do not include plan adoption, amendment, design or termination. Thus, it has long been the rule that an employer or plan sponsor does not act in a fiduciary capacity when adopting, modifying or terminating a welfare benefit plan. *Curtiss–Wright Corp.,* —— U.S. at ——, 115 S.Ct. at 1228 (citing *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990)).[2] "When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust[.]" *Lockheed Corp. v. Spink,* —— U.S. ——, ——, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996) (citations omitted).

In *Pope v. Central States Health and Welfare Fund,* 27 F.3d 211 (6th Cir.1994), this court extended the rule announced in *Adams* to a multi-employer welfare benefit plan such

---

**2.** The Supreme Court recently extended this rule to pension benefit plans in *Lockheed Corp. v.* *Spink,* —— U.S.——, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).

as the plan at issue here. The court explained:

> The trustees of a multi-employer plan do not act in the role of employers when enacting plan amendments which simply affect the allocation of an asset pool among participants and beneficiaries. However, multi-employer plan trustees assume a position analogous to that of a single-employer plan administrator when they amend a plan to protect its financial stability. As in cases involving single-employer plans, the policy encouraging employers to establish welfare benefit plans is served by permitting trustees of multi-employer plans to amend such plans without fiduciary considerations.

*Id.* at 213 (citations omitted).

■ Relying on *Pope*, the district court held that the trustees' decision to set independent contribution rates for each local was not subject to review for compliance with fiduciary duties. Plaintiffs contend that *Pope* does not apply because a decision of plan trustees is insulated from review for compliance with fiduciary duties only when the decision takes the form of a plan amendment, as it did in *Pope*. Despite the fact that the trustees' decision was unanimous, while the plan may be amended "in any respect at any time" by a majority vote of the trustees, plaintiffs contend that the lack of a formal amendment renders the trustees' decision subject to review for compliance with fiduciary obligations.

We are persuaded that *Pope* does not apply, although not entirely for the reasons advanced by plaintiffs. The lack of a formal amendment certainly provides a basis on which to distinguish *Pope*. Equally important, however, is the fact that the decision at issue was not one which affected plan design or which altered any existing plan terms.

Rather, the decision was an administrative one, squarely within the powers of the trustees to make, but one which did not "modify" or "amend" the plan. Thus, the trustees, in making this decision, did not act in a manner analogous to settlors of a trust, but, rather, as administrators exercising the discretionary authority granted to them under the plan.

■ This means, of course, that the trustees' actions are subject to review for compliance with ERISA's fiduciary obligations. Based upon the broad grant of powers to the trustees, however, we review the trustees' actions to determine only if they were arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Whisman v. Robbins,* 55 F.3d 1140, 1144 (6th Cir.1995) (plan provisions similar to those in this case entitled trustees to arbitrary and capricious standard of review). A determination by plan trustees will not be found to be arbitrary and capricious if it is rational in light of the plan's provisions. *Perry v. United Food and Commercial Workers Dist. Unions 405 and 442,* 64 F.3d 238, 242 (6th Cir.1995) (citing *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir.1991)).

> This standard "is the least demanding form of judicial review of administrative action.... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."

*Perry,* 64 F.3d at 242 (citation omitted).

■ Plaintiffs claim that the trustees breached their fiduciary duties as set forth in ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1),[3] by choosing to discriminate against the plaintiffs because they belonged to a different

---

**3.** Plaintiffs rely on § 1104(a)(1)(A), (B) and (D), which provide that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>> **(A)** for the exclusive purpose of:
>> (i) providing benefits to participants and their beneficiaries;
>> . . . .
>> **(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing

that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

> . . . .
>> **(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

local. According to plaintiffs, the trustees breached their duty of loyalty as well as their obligation under the plan not to divert any benefit for purposes other than for the exclusive benefit of the participants. The sole evidentiary basis for plaintiffs' argument is the fact that the plan's trustees were drawn from Local 522, an arrangement to which Local 633 agreed upon joining the plan. The fact that Local 633 was not represented on the board of trustees is not alone wrongful, however. As noted, the composition of the trustee body for a union-sponsored plan such as this is governed by LMRA § 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B), which requires only that employees and employers have equal representation, *not* parity between the representatives of each union. *International Bhd. of Teamsters, Joint Council 18 v. New York State Teamsters Council Health and Hosp. Fund,* 903 F.2d 919, 922 (2d Cir.), *cert. denied,* 498 U.S. 898, 111 S.Ct. 251, 112 L.Ed.2d 210 (1990). Nor will we infer that the trustees acted improperly merely because they necessarily would be affected by any decision which resolved the need to raise contribution rates. *See Mahoney v. Board of Trustees,* 973 F.2d 968, 971–73 (1st Cir.1992) (trustees' status as beneficiaries does not necessitate strict standard of review of their decisions; decisions remain subject to arbitrary and capricious standard of review).

Thus, we are left with the simple inquiry whether there was a reasonable basis for the trustees' decision. The answer cannot seriously be debated. The trustees were faced with a situation in which the plan was suffering significant losses that were attributable to the claims history of only one local's members. In light of these losses, the trustees were obligated to increase the contribution rates. Nothing in the plan prohibited them from doing so by instituting distinct rates, and their decision to do so appropriately placed the burden of the increased costs on the participants whose claims experience was responsible for those costs.

In reaching this decision, we draw guidance from *Mahoney v. Board of Trustees,* 973 F.2d at 973–74, a case in which the trustees of a multi-employer pension plan significantly increased the size of retirement pensions, but did so unevenly, treating participants who had already retired less favorably than those who were still working. Writing for the court, then-Judge Stephen Breyer held that this decision was not arbitrary and capricious. The court noted that increased pensions would require increased contributions, the burden of which would fall on those participants who were still working. It was thus fair to pay those workers the higher benefits. While noting that a perfect match between contribution and benefit level was neither a practical possibility nor legally required, the court recognized that the trustees' effort to achieve a reasonable level of parity was not arbitrary and capricious.

Just as it was reasonable for the trustees in *Mahoney* to attempt to match the level of benefit with the level of contribution, it was reasonable for the trustees in this case to match the level of contribution with the level of benefit provided. We thus conclude that the trustees' decision to institute independent contribution rates for each local was not arbitrary and capricious, and affirm the district court's grant of judgment in defendants' favor on this claim.

## B.

### Allegedly Unlawful Discrimination

Plaintiffs also claim that defendants violated ERISA § 510, 29 U.S.C. § 1140,[4] which prohibits discrimination against a participant for exercising a right protected by the plan or ERISA, or for the purpose of interfering with the attainment of any right to which the participant may become entitled. The district court dismissed plaintiffs' claim, holding that no impermissible discrimination occurred because the trustees did not

4. Section 1140 provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this subchapter.... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

interfere with a vested right to benefits. This court recently held, however, that § 1140 "prohibits interference with rights to which an employee 'may become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested." *Shahid v. Ford Motor Co.,* 76 F.3d 1404, 1411 (6th Cir.1996).[5] We nonetheless affirm the district court's decision on two independent grounds.

First, a plaintiff under § 1140 must demonstrate that the action at issue was taken with the specific intent to violate ERISA, i.e., that a motivating factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits. *Shahid,* 76 F.3d at 1411. The record is devoid of evidence supporting this element of a § 1140 claim. Rather, the record supports the conclusion that the trustees increased the contribution rates, first, to protect the solvency of the plan, and second, in an effort to distribute the cost of benefits fairly between the two locals. Rather than interfering with the attainment of benefits, the trustees' actions insured that the fund would remain solvent, and that each group of participants would receive the benefits for which they paid.

Second, as explained by this court in *Adcox v. Teledyne, Inc.,* 21 F.3d 1381, 1391 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994), § 1140 was enacted primarily to prevent employers from discharging or harassing their employees in order to prevent them from attaining benefits. " 'Congress designed [§ 1140] primarily to protect the employment relationship that gives rise to an individual's pension rights.' For conduct to fall within the parameters of § 1140, it 'must affect the individual's employment relationship in some substantial way.' Section 1140 'does not purport to protect the financial security of pension funds.' " *Id.* (quoting *West v. Butler,* 621 F.2d 240, 245–46 (6th Cir.1980)) (internal citations omitted). Plaintiffs have neither alleged nor demonstrated that the trustees' actions af-

fected their employment relationships as required by *Adcox.*

In sum, plaintiffs have not demonstrated that the trustees' actions constituted discrimination prohibited under § 1140.

**AFFIRMED.**

---

5. *Shahid* also resolves defendants' argument, not addressed by the district court, that plaintiffs lack standing to assert their claims. The court held that a plaintiff has standing where, but for the alleged wrongful acts, the employee " 'would

have been in a class eligible to become a member of the plan.' " *Shahid,* 76 F.3d at 1410–11 (quoting *Swinney v. General Motors Corp.,* 46 F.3d 512, 519 (6th Cir.1995)). Plaintiffs clearly meet that test here.