EASTERBROOK, Chief Judge.
CUNA Mutual Insurance Society maintains a health-care plan for the benefit of its retirees. Beginning in 1982 it gave retirees credit toward their share of the *555 cost, if they had unused sick-leave balances. CUNA Mutual calculated how much each person’s unused sick-leave days would be worth at that person’s daily wage. Workers covered by a collective-bargaining agreement could choose between taking that sum in cash or putting it toward the retiree’s premium. Management employees did not have that option. Executives who quit before retirement age, or who decided not to participate in the health plan, did not receive payment or any other form of compensation for unused sick leave. It had value only as a credit toward health-care costs during retirement.
Here is a simple example. An executive retires with unused sick leave valued at $50,000. CUNA Mutual contributes half of the $10,000 annual cost of health care; the employee is responsible for the rest. For 10 years, the employee’s portion is met by drawing down the sick-leave balance at a rate of $5,000 a year. Effectively CUNA Mutual covers 100% of the medical-care costs for a decade. Beginning in year 11, the retiree must pay $5,000 a year as his share of the health-care plan, and CUNA Mutual contributes the other $5,000.
Things changed at the end of 2008. CUNA Mutual amended the Plan and stopped paying any part of retirees’ health-care costs. This meant not only the end of CUNA Mutual’s explicit payment, but also the end of retirees’ ability to use their sick-leave balances to cover their portion, with one exception: Employees who could have taken their sick-leave balances in cash are treated as having done so and then invested that money in an account to be administered by the healthcare plan. Thus retirees who formerly worked under a collective-bargaining agreement continue to have the benefit of their sick-leave balances. But after the 2008 change these balances are used to pay 100% of the cost (until each account is exhausted), rather than 50% or whatever other sharing ratio was in place when the person retired.
A class of retirees filed this suit under the Employee Retirement and Income Security Act. The class representatives are four retired executives who never had an option to take their sick-leave balances in cash, plus one retiree who had that option but elected to leave the money on deposit. The district court granted judgment on the pleadings to CUNA Mutual and its Plan. 683 F.Supp.2d 918 (W.D.Wis.2010).
Health care is a welfare-benefit plan under ERISA. The statute recognizes two principal differences between pension plans and welfare-benefit plans. First, although pension plans must be funded, with assets held in trust, welfare-benefit plans need not be funded. See 29 U.S.C. § 1081(1) (exempting welfare-benefit plans from the funding requirements in § 1083). CUNA Mutual operates its Plan on a pay-as-you-go basis; general corporate revenues support all health-care benefits. Second, although pension benefits vest, welfare benefits do not. Employers are free to reduce or abolish benefits under welfare plans. See 29 U.S.C. § 1051(1) (exempting welfare-benefit plans from the vesting rules in §§ 1052-61). Employers nonetheless may create vested welfare benefits by contract. See, e.g., Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir.1993) (en banc); Vallone v. CNA Financial Corp., 375 F.3d 623, 632 (7th Cir.2004). CUNA Mutual’s healthcare plan does not promise vested benefits, and each version has contained a clause reserving its right to modify or eliminate the benefit. For example, the 1995 version of the Plan provides: “The Employer expects the Plan to be permanent, but since future conditions affecting the em *556 ployer cannot be anticipated or foreseen, the Employer must necessarily and does hereby reserve the rights to amend, modify or terminate the Plan ... at any time by action of its Board.” Language of this kind permits amendments. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).
One more legal proposition sets the stage for this appeal. The fiduciary duties created by ERISA are limited to the administration of a plan. When deciding what benefits to include in a plan, an employer is free to prefer its own interest (and that of its investors) over the interests of employees and retirees. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); Lockheed Corp. v. Spink, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). CUNA Mutual therefore was entitled to cut back on health benefits even though this dashed retirees’ expectations. But it still had to comply with any specific requirements in ERISA and the Plan’s organic documents.
The retirees’ principal argument is that CUNA Mutual violated 29 U.S.C. § 1106(a)(1)(D) by diverting plan assets to itself. This subsection prohibits any “transfer to, or use by or for the benefit of a party in interest, of any assets of the plan”. An employer is a statutory “party in interest”. 29 U.S.C. § 1002(14)(C). According to the retirees, sick-leave balances are assets of the Plan, assets that CUNA Mutual appropriated. They observe that, when CUNA Mutual amended the Plan, its balance sheet reflected a gain of more than $120 million. This must be the value of the seized assets, the retirees believe.
Plaintiffs misunderstand the nature of the sick-leave balances and the reasons why CUNA Mutual revised its accounting treatment. The sick-leave accounts of former managers don’t contain money and never did. They were not assets of the Plan, which always has been financed by cash from both retirees and CUNA Mutual. Far from being assets, these balances were liabilities: they represented amounts that CUNA Mutual had agreed to contribute to the Plan in lieu of cash from retirees. Any given retiree might have deemed the balance a personal asset, in the sense that it represented CUNA Mutual’s promise not to ask the retiree to pay for health care until the balance had been exhausted. But § 1106(a)(1)(D) deals with assets of the Plan, not with employers’ unfunded promises.
Because CUNA Mutual had pledged to pay part of all retirees’ health costs (and all of each employee’s costs, until the sick-leave balance reached zero), it had to carry this obligation as a liability on its books. Accounting conventions require employers to capitalize the value of future contributions. This is where the $120 million figure came from: CUNA Mutual estimated the amount it would need to pay each year (an amount that included the sick-leave balances, which represented payments that CUNA Mutual made before calling on retirees to chip in their own money) and then discounted this stream of payments to present value. The total was a little more than $120 million, reflected as a liability on the firm’s balance sheet. When CUNA Mutual amended the Plan in 2008 so that it no longer paid for retirees’ health care, it removed this debit. The result was a onetime gain. Yet no assets changed hands; CUNA Mutual did not take anything out of the Plan. It simply reduced the amount it would pay in. Section 1106(a)(1)(D) has not been violated.
As the retirees see things, if the sick-leave balances were not “assets of the plan”, then they must be outside of ERISA and governed by state law. See Massachusetts v. Morash, 490 U.S. 107, 109 S.Ct. *557 1668, 104 L.Ed.2d 98 (1989); see also 29 C.F.R. § 2510.3-l(b)(2) (defining those fringe benefits that are not treated as ERISA plans). As the district court observed, however, this part of the retirees’ argument has the same flaw as the reliance on § 1106(a)(1)(D). It conceives of the sick-leave balances as an asset that the employer has appropriated. In Morash the Court held that an employer’s vacation leave system, which provided that unused time would be compensated as days worked, was not a welfare-benefit plan under 29 U.S.C. § 1002(3). This meant that ERISA did not preempt state law, which required employers to keep their promises about employees’ compensation. CUNA Mutual, by contrast, never promised managerial workers that it would pay them for unused sick days. The question in this litigation is not what value unused sick leave had outside an ERISA plan but what value it has within this Plan — which is a welfare-benefit plan under § 1002(3). State law does not affect whether an ERISA plan must allow retirees to treat unused sick leave as a substitute for money-
This leaves the retirees’ argument that the Plan itself created vested rights. The problem with this argument is that every version of the Plan reserved the right to change required contributions or even eliminate healthcare benefits. CUNA Mutual never told its workers that rights were “vested” or would continue for their “lifetime.” Not that “lifetime” is a magic word; as we observed in Vallone, “ ‘lifetime’ may be construed as ‘good for life unless revoked or modified.’ ” 375 F.3d at 633. What such a word means depends on context — including the context provided by language expressly reserving the right to change or eliminate benefits, language that CUNA Mutual’s Plan shares with the plan at issue in Vallone.
Instead of contending that they had been assured that health benefits were vested (or any equivalent), the retirees try to flip the burden. They observe that many documents handed out by CUNA Mutual — including the forms that they signed when enrolling in the Plan — did not contain a reservation of rights to change the Plan. That omission could matter if an employer must show, not only that the right to amend had been reserved, but also that this reservation was known to all workers. That is not, however, an employer’s burden. To establish that rights have vested as a matter of contract, the plan participant must demonstrate that the employer tied its own hands. The absence from any given communication of language reserving a right to amend a plan is some distance from the presence of language negating that entitlement. Silence is just that — silence. Participants need more than silence to establish vested rights to lifetime benefits. So we held in Bidlack, Vallone, and many other decisions, including Cherry v. Auburn Gear, Inc., 441 F.3d 476 (7th Cir.2006), and United Auto. Workers v. Rockford Powertrain, Inc., 350 F.3d 698 (7th Cir.2003).
CIGNA Corp. v. Amara, — U.S. -, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011), holds that silence in a summary plan description about some feature of a pension plan does not override language in the plan itself. The Justices observed that it is essential to a “summary” plan description that things be left out; a summary plan description covering every feature of a plan would not be a “summary.” Moreover, the Court held, even if a summary plan description contradicts the full plan, the terms of the full plan continue to govern participants’ entitlements. ERISA directs judges to enforce the terms of a plan; it does not authorize judges to change those terms. 29 U.S.C. § 1132(a)(1). See *558 131 S.Ct. at 1876-80. A participant who draws an unfounded inference from an omission from a summary plan description is not entitled to a remedy. And if this is true about gaps in a summary plan description — a document that ERISA itself requires plan sponsors to give to all participants, see 29 U.S.C. § 1022(a) — then silence in an election form cannot override the terms of a plan.
Just as it would be a mistake for an employer to lard a summary plan description with the complexities of a full plan, it would be a blunder to add pages of caveats and reservations to an election form, which is supposed to be simple. People who want more details can look to other documents. It takes time to read and understand extra information, and the addition of hard-to-digest notices can lead to errors by masking the nature of the choice that a participant needs to make. Employers that want to help their workers make intelligent retirement decisions should pare down forms so that they focus on what
matters most. See Omri Ben-Shahar & Carl E. Schneider, The Failure of Mandated Disclosure, 159 U. Pa. L.Rev. 647 (2011). See also Todd v. Societe BIC, S.A., 9 F.3d 1216, 1218-19 (7th Cir.1993) (en banc); Robinson v. McNeil Consumer Healthcare, 615 F.3d 861, 869-70 (7th Cir. 2010). Cf. Jerry Avorn & William Shrank, Highlights and a Hidden Hazard — The FDA’s New Labeling Regulations, 354 N.E. J. Medicine 2409 (2006). Our retirees do not say that they were misled by the election forms; they would have opted into the Plan no matter what the forms said. (To repeat for the last time: There was nothing else the executives could have done with the unused sick-leave balances, and the union workers, who had a choice to cash out, are receiving full credit for those balances, just as if they were funds on deposit.)
The retirees had an expectation, to be sure: Many a day they may have struggled in to work, despite ailments that could have justified taking time off, in order to preserve their sick-leave balances and thus earn credit toward medical care in retirement. But although expectation interests may lead employers to refrain from reducing retirees’ benefits — employees would be more likely to call in sick, or demand higher wages or vested pension benefits, if arrangements such as CUNA Mutual’s pre-2008 policy prove to be unstable— equitable considerations do not reduce employers’ legal entitlement to change welfare-benefit plans. Hughes Aircraft and Lockheed hold that employers are entitled to disregard employees’ interests when amending ERISA plans. If silence in election forms and summary plan descriptions cannot override the express terms of the formal plan, silence in the long years before retirement (the decades when employees had to decide 200 days a year whether to work or call in sick) cannot override a plan’s express terms.
Reliance interests are universal. The terms of the pension or welfare plan in force when a given worker is 30, 40, or 50 affect how much that worker saves privately and how long the person continues to work. Yet those interests do not prevent employers from changing their plans once the worker reaches 60, 70, or 80. ERISA forbids any reduction in vested pension benefits but gives employers discretion over other benefits. If reliance interests block a reduction in welfare benefits, then the distinction between pension and welfare plans would be abolished, and Hughes Aircraft and Lockheed would be effectively reversed.
CUNA Mutual reserved the right to amend its healthcare plan. It is a business *559 decision, not a legal question, whether to use that authority to retirees’ detriment.
Affirmed