In re: **WILLIAMS COMPANIES ERISA LITIGATION**

Nos. 02–CV–153–H(M), 02–CV–159–H(M), 02–CV–285–H(M), 02–CV–289–H(C).

United States District Court, N.D. Oklahoma.

July 14, 2003.

**1330**

David R Scott, McGivern, Gilliard, Curthoys, Tulsa, OK, William B Federman, Federman & Sherwood, Oklahoma City, OK, David Scott, James E Miller, David R Scott, Scott & Scott, Colchester, CT, James D Baskin, III, Baskin Law Firm, Austin, TX, Marc L Ackerman, Brodsky & Smith LLC, Bala Cynwyd, PA, for Plaintiffs.

Graydon Dean Luthey, Jr., Hall Estill Hardwick Gable, Golden & Nelson, Tulsa, OK, Howard Shapiro, Rene Elizabeth Thorne, Robert Wilkinson Rachal, Shook Hardy & Bacon LLP, New Orleans, LA, for Defendants.

## ORDER

HOLMES, District Judge.

This matter comes before the Court on the Motion of Defendant The Williams Companies, Inc. and Director Defendants Pursuant to Fed.R.Civ.P. 12(b)(6) to Dismiss the Amended Consolidated Complaint for Failure to State a Claim Under ERISA (Docket No. 80), filed January 27, 2003; and Defendant Members of the Investment and Benefits Committees of the Williams Companies' Motion to Dismiss Pursuant to Rule 12(b)(6) (Docket No. 76), filed January 27, 2003. For the reasons set forth below, the Motion to Dismiss by The Williams Companies, Inc. ("Williams") and the Board of Directors (the "Board") is hereby granted and the Motion to Dismiss by the Members of the Investment and Benefit Committees (collectively, the "Committee Defendants") is hereby denied.

### I

A motion to dismiss should be granted only when it appears that plaintiffs can prove no set of facts in support of a claim that would entitle plaintiffs to relief on that claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the Court must view the complaint in the light most favorable to plaintiffs and resolve every doubt in plaintiffs' favor. The plaintiffs' allegations are to be taken as true for the purpose of ruling upon the motion. *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). In addition, any inference reasonably drawn from the complaint must be considered together with plaintiffs' allegations of fact. *Murray v. City of Milford,* 380 F.2d 468, 470 (2d Cir.1967).

In the present case, the Amended Consolidated Complaint (the "Complaint") arises out of certain actions involving The Williams Companies, Inc. Investment Plus Plan (the "Plan"). Defendants refer to

certain Plan documents and rely upon provisions of the Plan in support of their motion to dismiss.

Plaintiffs do not challenge Defendants' reliance upon the Plan in support of the motion to dismiss. To the contrary, Plaintiffs also rely upon the language of the Plan. Accordingly, the Court will consider language contained in the Plan documents in considering Defendants' motions to dismiss. *See Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993) ("When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' ... complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.").

## II

The instant case is based upon certain alleged actions by Defendants in relation to the Plan. For purposes of the instant motion, the Court accepts the following description of the Plan set forth in Defendants' papers.[1]

The Plan is an individual account plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") 29 U.S.C. § 1001, *et seq. See* § 3(34), 29 U.S.C. § 1002(34). Each participant in the Plan has an individual account, and his or her plan benefit is based solely on the value of that account, *i.e.,* the contributions to the account plus any earnings and less any losses or allocated expenses. *Id.*

The Plan is also an "employee pension benefit plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and has both an employee and employer contribution feature. The former feature permits, but does not require, employees to invest a portion of their salary in any of a variety of options, including Williams stock. Because the Plan is a "401(k) plan," these investments are made on a tax-deferred basis. The latter feature provides that Williams will make voluntary employer matching contributions as well as employer bonus contributions, both solely in Williams common stock.[2]

The inclusion of Williams stock as a feature in both the employee and employer components of the Plan derives from its status as an "eligible individual account plan" under ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3). Unlike defined benefit plans, eligible individual account plans are expressly exempted from ERISA's diversification requirements, which would otherwise limit the holding of Williams stock. *See* ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2). Congress enacted this exemption because it believed that, in permitting unlimited investment in employer

---

1. On April 1, 1998, The Williams Companies, Inc. Investment Plus Plan merged with the MAPCO Inc. Profit Sharing and Savings Plan, resulting in an amended and restated April 1, 1998 Plan ("4/98 Plan"). Since that time, several other plans were merged, and, as a result, the Plan was again amended and restated on July 1, 2001 ("7/01 Plan"), although the basic substantive provisions remained largely the same. Because the relevant period begins on July 24, 2000, both plans are involved in this litigation. For purposes of this order, except as otherwise stated, the quoted language will be from the 7/01 Plan.

2. The employer bonus contributions are made under the Plan's Bonus Employee Stock Ownership Plan, or "BESOP."

securities, such plans are a "device for expanding the national capital base among employees—an effective merger of the role of capitalist and worker." *Donovan v. Cunningham*, 716 F.2d 1455, 1458 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

Consistent with this objective, the Plan's first Article states that it "shall constitute a qualified employee stock ownership plan designed to invest primarily in qualifying employer securities ...." *See* 7/01 Plan, Art. I, 4/98 Plan, Art. I. The original Investment Plus Plan Trust Agreement, which is incorporated into the Plan, is to the same effect: "The Plan's primary purpose [is] investing in and holding common stock of the Company for the benefit of Plan Participants and beneficiaries ...." *See* 4/98 Trust § 5.6(a). In furtherance of this purpose, the Plan expressly authorizes investment of "up to 100%" of its assets in Williams stock. *See* 7/01 Plan § 7.8, 4/98 Plan § 7.12. *See also* 7/01 Trust § 4(e)(ii).

### A.

The Plan's "saving" feature permits participating employees to contribute from 1% to 16% of their income, on a tax-deferred basis, into any one of several investment funds. *See* 7/01 Plan § 4.2. At all times, the Plan has offered a wide range of investment options for employee contributions: eighteen in the current version of the Plan, ten in its predecessor. *See* 7/01 Plan §§ 2.41, 7.10; 4/98 Plan §§ 2.39, 7.9.[3] Available options include a stable value fund as well as a variety of fixed income and equity funds of varying levels of risk and potential reward. 7/01 Plan § 7.10; 4/98 Plan § 7.9. The Plan also offers participants a "self-directed account" allowing a wide range of investment choices. *See* 7/01 Plan § 7.10(m); 4/98 Plan § 7.9(j). Finally, consistent with both Congress' desire to foster employee stock ownership and the Plan's status as "an eligible individual account plan," the Plan explicitly includes "Common Stock of the Williams Companies" as an investment option (*see* 7/01 Plan § 7.10(*l*); 4/98 Plan § 7.9(i)) and permits *all* Plan assets to be invested in Williams stock. *See* 7/01 Plan § 7.8; 4/98 Plan § 7.12.

The employee-participants had responsibility for deciding how their contributions would be invested. As the Plan states, "An Active Participant may direct the Trustee, ... to invest his future Employee Contributions in one or more of the Plan's Investment Funds ...." 7/01 Plan § 6.1(a); 4/98 Plan § 6.1(a). Participants could select their investment options at any time and change their investment choices on a daily basis. 7/01 Plan §§ 6.1(b), 6.2(a)(1), (2),; 4/98 Plan §§ 6.2(a), (b). *See* Summary Plan Description ("SPD"),[4] dated October 2000 ("10/00 SPD"), 15.

**3.** The 4/98 Plan was amended in June 1999 to include the common stock of William Communications Group, Inc. ("WCG") as an investment option for participants in connection with the spin-off of WCG from Williams. *See* Second Amendment to the Williams Investment Plus Plan, effective June 1, 1999, §§ 6.7, 7.9(k). Following the initial stock offering, no further new investments in WCG stock were permitted. *See* 7/01 Plan § 7.10(*l*). *See also* Summary Plan Description tion 8 (dated Oct. 1, 2000) ("10/00 SPD"). However, participants were always free to convert their WCG stock into other investment options. *See e.g.*, 7/01 Plan § 6.2.

**4.** There were three versions of the SPD for the Plan issued during the relevant class period. The most recent was issued in December 2002, with an effective date of July 1, 2001 ("7/01 SPD"). Virtually identical prior ver-

The 10/00 SPD emphasized that the participant alone was responsible for making his or her investment choices, notifying participants that "[y]our contributions are invested at your direction in a choice of several different investment funds, or in Williams Common Stock." *See* 10/00 SPD. To aid participants in making their decisions, the SPD set forth certain information concerning each fund, including the respective level of risk.[5] The SPD warned that investment options other than the stable value fund "carry more risk," and "are more vulnerable to the ups and downs of the stock and bond markets." *Id.* It further warned that "[i]f you elect to participate in the Plan, you also accept the corresponding risk of loss in the Plan's funds." *Id.* Finally, the SPD cautioned that participants may not receive their expected benefits because "[a]s with any investment, the value of the Plan investments may decrease . . . ." *Id.*

With respect to investment in Williams common stock, the SPD informed participants that "[a]s with any single common stock investment, the value of the shares could fluctuate considerably, influenced by general stock market trends as well as the performance of The Williams Companies, Inc. group of companies." 10/00 SPD. A similar warning was provided to participants considering investment in WCG stock. *See id.*

Based on the participants' wide range of investment options and control over them, the Plan was designed and described to participants as a "404(c)" plan:

> The Plan is intended to constitute a plan described in Section 404(c) of the Employee Retirement Income Security Act and Title 29 of the Code of Federal Regulations Section 2550.404C–1.

10/00 SPD.

### B.

The Plan also promoted employee ownership through Williams voluntary match, which was "invested solely in Williams common stock." *See* Compl. ¶ 12. Section 5.4 of the Plan provides that "[a]ll Employer Matching Contributions made to this Plan . . . shall be invested . . . in Common Stock." 7/01 Plan § 5.4.[6] While the amount of these contributions differed for management and occupational employees,

sions were issued on January 1, 2000 and October 1, 2000.

Although the SPDs are not specifically cited in the Complaint, they are implicitly referred to throughout and therefore the Court accepts for the record the copies of the SPDs submitted by Defendants.

5. Specifically, the SPD provided the following information concerning each investment fund: (1) descriptions of each investment option based on information from the legal prospectus for each option; (2) information on how to obtain a prospectus for each mutual fund; and (3) information on how to obtain (a) the annual operating expenses of each option, (b) the aggregate amount of such expenses expressed as a percentage of average net assets of the options, (c) copies of any financial statements and reports which are available to the Plan, (d) a list of assets of each option which constitutes plan assets and the value of each such asset (or the proportion of the investment option of which it comprises), (c) information on past and current investment performance for each option, and (f) information on the value of shares or units in designated investment options held in each investment account. *See* 10/00 SPD.

6. Pursuant to the terms of the Plan, Williams had the option to make its initial contributions either in cash or in Williams common stock. However, all cash contributions were required to be subsequently invested in Williams common stock. *See* 7/01 Plan § 5.4; 4/98 Plan § 5.3.

Williams matched contributions for all participants who contributed to the Plan "dollar-for-dollar up to 6 percent of the participants' eligible compensation." *See* 7/01 Plan §§ 4.1, 5.1; 4/98 Plan §§ 4.1, 5.1. As a matter of Plan design, the employer match could be made only in common stock, which is defined to be the stock of Williams. 7/01 Plan §§ 5.4, 2.13, 2.14. *See also* 4/98 Plan at §§ 5.3, 2.13, 2.14.

The BESOP was structured such that Williams common stock was allocated annually to the accounts of participating employees on a *pro rata* basis according to eligible compensation. The Plan provides that Williams would contribute cash to the BESOP in an amount determined by the Board each year to be used first to pay principal and interest due on loans taken out by the Plan Trustee to purchase Williams common stock, with any excess contributions being used to purchase additional shares of Williams common stock to be allocated to participants' BESOP accounts. *See* 7/01 Plan App. II, §§ 3.1, 3.2(a) and (b); 4/98 Plan App. III §§ 3.1, 3.2(a) and (b). In addition to these cash contributions, the Board had the discretion to make further contributions to the BESOP directly in the form of Williams common stock. *See* 7/01 Plan App. II, § 3.3; 4/9 Plan App. III, § 3.2A.

While the Plan was designed so that the Company's match and BESOP contributions were initially made in Williams stock, the Plan provided that participants could diversify out of their match and BESOP accounts when their employment was terminated or upon reaching a designated age—initially 55, later lowered to 50. *See* 4/98 Plan § 6.4; 7/01 Plan § 6.4.

### C.

The primary duties and fiduciary responsibilities of both the Benefits Committee and the Investment Committee are set forth in Article IX of the Plan, which provides in applicable part as follows:

> Under certain circumstances, the Trustee, the Board of Directors, the Benefits Committee, the Investment Committee, the Investment Managers, or the Administrative Committee may be determined by a court of law to be a fiduciary with respect to a particular action under the Plan or the Trust Agreement.

7/01 Plan § 9.1; 4/98 Plan § 9.1. Article IX makes clear that each of these named entities has distinct and separate responsibilities:

> [T]o prevent any two parties to the Plan from being deemed co-fiduciaries with respect to a particular function, both the Plan and the Trust Agreement are intended, and should be construed, to allocate to each party to the Plan only those specific powers, duties, responsibilities, and obligations as are specifically granted to it under the Plan or Trust.

*Id.* The respective nature of each party's Plan responsibilities is further described in the same Article:

> The Plan is intended to allocate to each named fiduciary the individual responsibility for the prudent execution of the functions assigned to it, and none of such responsibilities or any other responsibility shall be shared by two or more of such named fiduciaries unless such sharing is provided for by a specific provision of the Plan.

7/01 Plan § 9.7; 4/98 Plan § 9.7.

The powers of the Benefits Committee are enumerated in Article IX as:

> (1) amending the Plan, except to the extent such authority is reserved to the Board of Directors;

(2) approving any merger or spin-off of any part of the Plan;

(3) appointing, removing, or replacing the Trustee, Investment Managers, any member of the Administrative Committee or any member of the Investment Committee; and

(4) delegating its duties to other entities, including the Investment Committee.

7/01 Plan § 9.3(b); 4/98 Plan § 9.3(b). The Benefits Committee also has authority under this section to appoint other specialists it deems "necessary or desirable" in connection with Plan administration. *Id.* In Article VII of the Plan, the Benefits Committee is authorized to delete or establish an Investment Fund. *See* 7/01 Plan § 7.14; 4/98 Plan § 7.14.

The Investment Committee, whose members are appointed by the Benefits Committee, has the duty of recommending investment options to the Benefits Committee and recommending investment managers who actually invest the contributions in each fund. The Investment Committee also is responsible for monitoring the performance of the investment funds and investment managers and for implementing any investment objectives or guidelines established by the Benefits Committee. *See* 7/01 Plan § 9.5(b); 4/98 Plan § 9.5(b). The Plan does not authorize the Investment Committee to either add or subtract investment options from the Plan.

## III

In their Complaint, Plaintiffs allege that various Plan fiduciaries failed to fulfill their fiduciary duties under ERISA with respect to the Plan and its participants and beneficiaries by: (1) failing to provide participants with complete and accurate information with respect to the Plan's investment in Williams stock and WCG stock, and (2) failing to monitor the Plan's investments and the conduct of other fiduciaries in connection with the Plan's investments. Plaintiffs' specific allegations are described below.

The Complaint, in paragraphs 235, 239 and 246, alleged the misinformation provided to Plan participants and beneficiaries as follows:

(a) Beginning on or before July 24, 2000, the prospects for the successful operation of WCG (then a wholly owned subsidiary of Williams) was increasingly doubtful throughout the class period due to an emerging and steadily worsening glut of capacity in the fiber optics network business and increasing costs associated with completing and operating the network, notwithstanding repeated misleading, optimistic, and lulling pronouncements by Williams and its leadership to the market as detailed herein;

(b) Williams' intention to separate itself from WCG as announced in July of 2000 was motivated by a desire to limit its exposure to the known problems in WCG rather than a good faith belief that WCG would have more ready access to capital as a stand alone entity as detailed herein;

(c) From the announcement in July of 2000 of the planned separation of Williams from WCG, the planned and actual exposure of Williams to the business and credit problems of WCG following the separation materially exceeded any exposure described by Williams to the marketplace as detailed herein, and the materiality of the actual and disclosed exposure was of far greater significance than it might otherwise have

been due to the aforementioned growing glut in fiber optic capacity and increasing network costs;

(d) The results of the EM & T portion of Williams' business were materially overstated by Williams due to the misvaluation of its assets (including contracts for the purchase and sale of energy) by failing to adequately discount for the credit (default), interest rate, and pricing risks inherent in these assets, and by failing to appropriately project the future price of energy in estimating the future cash flow to be generated by its energy assets, as detailed herein; and

(e) The risks associated with the EM & T business and the credit guarantees given by Williams to WCG were materially understated by Williams due to misleading statements about the risk management practices, hedging practices, and internal controls of Williams, as detailed herein.

Moreover, the Complaint contains specific examples of alleged factual misstatements and omissions relating to the condition of WCG in July 2000, and thereafter, as follows:

● In its July 24, 2000, press release Williams "did not disclose that WCG was operating below company sponsored expectations." (Compl.¶ 76.)

● Notwithstanding a general background of problems in the fiber optic industry, WCG (then still part of Williams) claimed record setting results and claimed that it remained on target to produce revenue "greater than current analyst consensus" in a press release issued on October 25, 2000. (Compl.¶ 80.)

● Similar claims that network revenues were on target were made by Williams on January 3, 2001. (Compl.¶ 86.)

● These claims were repeated by WCG on February 5, 2001, and February 15, 2001, when it was still part of Williams. (Compl.¶¶ 93, 96.)

● On April 19, 2001, after the record date for the spin-off of WCG from Williams, WCG again indicated that its revenue expectations were on track notwithstanding that "it was impossible for WCG to meet its financial goals for 2001 without substantially revising estimates to include massive cap-ex spending reductions." (Compl. at ¶¶ 106–107.)

These statements allegedly were made with scienter and had the effect of inflating the market price of Williams and WCG stock. (Compl.¶ 265.) As a result, according to Plaintiffs, the acquisition of employer stock with cash by the Plan, whether directed by Plan participants or by the Benefits Committee, occurred at inflated prices and without regard to the real risks that these shares presented. (Compl.¶ 265.) Furthermore, the shares that the Benefits Committee, with the advice of the Investment Committee, allowed the Plan to accept in satisfaction of Williams' contribution obligations, were allegedly overpriced such that fewer shares were required to satisfy these obligations. (Compl.¶ 265.)

Finally, the Plan allegedly held Williams and WCG shares while the participants who had the authority to instruct the Plan to sell shares were deprived of the information they needed to make an intelligent decision about whether to hold the shares. Consequently, Plaintiffs contend, the shares contributed by Williams were held without regard to information suggesting it was imprudent. (Compl.¶¶ 232–235.) Plaintiffs allege that had Defendants performed their respective fiduciaries duties, the Plan would not have acquired the

shares at issue either for cash or in exchange for Williams' obligations to contribute to the Plan, at least not at inflated prices, and such shares would not have been held without regard to the actual financial risks of doing so. (Compl.¶¶ 262–63.)

Plaintiffs allege that the Benefits Committee had the specific authority to add and drop Investment Funds (including the Williams and WCG stock funds) and thus to cease purchases of Williams and WCG shares, and to divest the Plan of those shares. (Compl.¶¶ 61–64, 242–248.) While the Benefits Committee could not violate securities laws by trading on inside information, Plaintiffs contend they had a duty to disclose the truth about Williams, to halt purchases and acquisitions of Williams and WCG stock by the Plan when prudence and loyalty required, and, subject to limitations on insider trading, to divest the Plan of Williams and WCG shares when prudence and loyalty required. (Compl.¶¶ 61–64, 232–235, 242–248.) This duty allegedly did not conflict with any duty under the securities laws, so long as it was undertaken in a fashion that did not constitute or facilitate insider trading.

Plaintiffs further allege that the Investment Committee was to have assisted the Benefits Committee by monitoring and advising it concerning the Investment Funds comprising the Plan, including the Williams and WCG stock funds. (Compl.¶¶ 61–64.)

According to Plaintiffs, the duties of the members of the Board arose out of their authority to appoint the members of the Benefits Committee and their consequent duties to monitor their performance and disclose to them the information they needed to know to fulfill their responsibilities. (Compl.¶¶ 61–64.)

Finally, Plaintiffs allege that the fiduciary duty of Williams itself results from the Plan's assignment to Williams' Board the authority to appoint and remove members of the Benefits Committee. (Compl.¶¶ 61–64.) According to Plaintiffs, the Board exists as a Board only so that it can act on behalf of Williams; its conduct, as a Board, is necessarily attributable to Williams. Thus, while Williams' duties are derived from the duties of the Defendants who are members of Williams' Board of Directors (the "Director Defendants"), actual knowledge of misstatements about Williams' financial condition cannot be denied by Williams, even if a particular director can claim that he or she did not know. Plaintiffs therefore claim that as a party knowingly satisfying its contribution obligations to the Plan with inflated stock, Williams cannot escape liability for participation in the violations of other defendants, even if it is not held to be a fiduciary. (Compl.¶¶ 257–265.)

## IV

The specific claims against Williams and the Board are as follows: (i) Count II: Williams and the Board "knew or should have known" that the subject financial information was materially false or misleading and therefore their failure to issue, directly or indirectly, corrective disclosures was a breach of fiduciary duty; (ii) Count IV: Williams and the Board failed to monitor the Benefits Committee for not investigating and correcting the allegedly false and misleading subject financial information and that such failure was a breach of fiduciary duty; (iii) Count VI: Williams allegedly withheld material information and made misleading disclosures and that such actions were a breach of fiduciary duty; and (iv) Count VII:

Williams, in the alternative, "knowingly participated in the above alleged breaches."

Both Williams and the Board assert that Plaintiffs have failed to state a claim under applicable law and therefore the action should be dismissed. The Court will address the claims against each of these Defendants in turn.

### A. Claims Against Williams

■ At the outset, Plaintiffs assert that Williams was an administrator of the Plan and as such had a fiduciary responsibility to Plan participants. The Plan provisions, however, do not support this assertion. The responsibility to administer the Plan belongs to the Investment Committee and the Benefits Committee. Williams, as settlor or sponsor of the Plan, does not act as a fiduciary. As the Supreme Court stated in *Lockheed v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996):

> Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans in *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), "employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." (citing *Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 947 (6th Cir.1990)). When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.

*Spink*, 517 U.S. at 890, 116 S.Ct. 1783. Because Williams is not a fiduciary, it cannot be liable for the breaches of fiduciary duty alleged by Plaintiffs in Counts II, IV, and VI of the Complaint.

In Count VII, Plaintiffs allege that Williams participated in a breach of fiduciary duty by continuing to offer participants the opportunity to invest in Williams stock. This claim must fail since the record reflects that Williams did not control investment decisions. Plaintiffs further allege that Williams participated in a breach of fiduciary duty by making material misrepresentations and nondisclosures concerning Williams' future performance. This claim also must fail, since the record reflects that such statements, regardless of truth or falsity, were not made by Williams in any fiduciary capacity regarding the Plan. In this regard, Plaintiffs' reliance on *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), is misplaced. In *Varity Corp.*, unlike here, the company was the Plan administrator under the governing Plan documents. Finally, Plaintiffs allege that Williams participated in a breach of fiduciary duty by mismanaging Plan assets. This claim also must fail since Williams clearly was not charged with this responsibility under the Plan documents.

Viewing the Complaint and drawing all reasonable inferences in the light most favorable to the non-moving party, the Court finds that Plaintiffs can prove no set of facts in support of their claims against Williams that would entitle them to relief. Therefore, Williams' motion to dismiss is hereby granted.

### B. Claims Against the Board

■ While the Board does have a fiduciary responsibility with respect to the Plan, it is a limited one. An ERISA fiduciary is defined as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discre-

tionary control respecting management of such plan or exercises any authority or control respecting the management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (1999). Here, the only power the Board had under the Plan was to appoint, retain, or remove members of the Benefits Committee. Plan § 7.1. Thus, the Board's fiduciary obligations can extend only to those acts. *See Ind. Ass'n of Publishers' Employees, Inc. v. Dow Jones & Co., Inc.,* 671 F.Supp. 1365, 1367 (S.D.N.Y.1987); ERISA §§ 3(21)(A), 29 U.S.C. §§ 1002(21) (defining fiduciary). The Complaint does not allege that any member of the Board breached any fiduciary duty arising out of the appointment of the members of the Benefits Committee.

In their Complaint, Plaintiffs assert two causes of action against the members of the Board: (i) Count II: the members of the Board "knew or should have known" that the subject financial information described above was materially false or misleading and their failure to issue, directly or indirectly, corrective disclosures was a breach of fiduciary duty; (ii) Count IV: the members of the Board breached their fiduciary duty to monitor the Benefits Committee, which, in turn, failed to investigate and correct the subject financial information.

The Court finds that these claims against the members of the Board must fail. First, the power of the Board under the Plan is limited to appointing, retaining, and removing members of the Benefits Committee. Second, Plaintiffs do not allege that the Board breached its fiduciary responsibility in its appointment of the members of the Benefits Committee. Finally, under the Plan documents, the Board does not have the power to control investment options or to communicate Plan information. Applying the reasoning of *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222 (W.D.N.Y.2002) to the instant case, the Court hereby grants Defendants' motion to dismiss. *See also Hull v. Policy Mgt. Sys. Corp.,* No. CIV.A.3:00–778–17, 2001 WL 1836286 (D.S.C. Feb. 9, 2001).

## V

The motion to dismiss by fourteen members of the Investment and Benefits Committees [7] (the "Committee Defendants") presents an entirely different set of issues. In their Complaint, Plaintiffs assert three causes of action against the Committee Defendants: (i) Count I: alleging a breach of the "Duty to Disclose and Inform"; (ii) Count III: alleging a breach of the "Duty to Eliminate Inappropriate Investment Options"; and (iii) Count V: alleging a breach of the "Duty to Avoid Conflict of Interest."

As described above, the provisions of the Plan applicable to the Benefits Committee are primarily set forth in Article IX. The responsibilities of this committee include appointing such financial specialists as it deems "necessary or desirable" in connec-

---

**7.** The following individuals serve on one or both of these committees: Nick Bacile, Keith E. Bailey, John Bumgarner, Travis Campbell, R. Rand Clark, James Ivey, Michael Johnson, Howard Kalika, Marcia MacLeod, Jack D. McCarthy, Ron Mucci, Scott Welch, Mark Wilson, and Phillip D. Wright.

tion with Plan administration. In addition, Article VII of the Plan authorizes the Benefits Committee to delete or establish an Investment Fund. *See* 7/01 Plan § 7.14; 4/98 Plan § 7.14.

Under Article IX of the Plan, the members of the Investment Committee are appointed by the Benefits Committee. The Investment Committee is charged with recommending investment managers who would actually invest the contributions in each fund. More importantly, for purposes of the instant motion, the Investment Committee is also responsible for monitoring the performance of the investment funds and investment managers and for implementing any investment objectives or guidelines established by the Benefits Committee. *See* 7/01 Plan § 9.5(b); 4/98 Plan § 9.5(b). Under the Plan, the Benefits Committee, and not the Investment Committee, is charged with the responsibility of adding or deleting investment options from the Plan.

In support of their motion to dismiss, the Committee Defendants argue that (1) they had no duty to disclose material non-public financial information and, in any event, any such disclosure would have constituted a violation of federal securities laws; (2) they had no duty to eliminate Williams as an investment option and, even if they did, § 404(c) of ERISA insulates the Committee Defendants from liability; and (3) they had no duty to avoid any alleged conflict of interest. For the reasons set forth below, the Court rejects these arguments and finds that the motion to dismiss of the Committee Defendant should be denied.

As noted above, for purposes of the instant motion, the Court accepts as true the allegations in the Complaint. Thus, the Court accepts as true that the Committee Defendants "knew or should have known" each of the alleged facts described in Section III above. The question becomes, therefore, whether the failure to act on such knowledge was consistent with the legal duties of the Committee Defendants.

At the outset, the Court must determine whether the Committee Defendants are fiduciaries and therefore potentially liable for a breach of fiduciary duty under ERISA. The Benefits Committee members concede their role as fiduciaries.[8] Moreover, as discussed below, the Court finds that the members of the Investment Committee are fiduciaries as well.

■ As set out above, an ERISA fiduciary is defined as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA §§ 3(21)(A), 29 U.S.C. §§ 1002(21)(A). Under ERISA, a fiduciary is permitted to wear "two hats," for example, as employer and fiduciary. *Pegram v. Herdrich*, 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000); *Amato*

---

**8.** Consistent with this concession, the Court finds that under ERISA the members of the

Benefits Committee clearly are fiduciaries as a matter of law.

*v. W. Union Intl., Inc.*, 773 F.2d 1402, 1417 (2d Cir.1985).

■ While ERISA's definition of fiduciary is "to be broadly construed," *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997), an individual cannot be liable as an ERISA fiduciary solely by virtue of his or her position as a corporate officer, shareholder, or manager. *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir.1993). Because a fiduciary may wear "two hats," the statute does not describe fiduciaries simply as administrators of the plan, or managers, or advisers. Instead, it defines an administrator as a fiduciary only to the extent that he or she acts in such a capacity in relation to a plan. *Pegram*, 530 U.S. at 225–26, 120 S.Ct. 2143 (citing Section 1002(2)(A)).

■ In sum, ERISA defines a fiduciary "in *functional* terms of control and authority over the plan." *Mertens*, 508 U.S. at 262, 113 S.Ct. 2063. The "threshold question" in an action charging breach of a fiduciary duty under ERISA "is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226, 120 S.Ct. 2143.

Those who are fiduciaries under ERISA have "a number of detailed duties and responsibilities, which include the proper management, administration, and investment of plan assets, the maintenance of proper records, the disclosure of specified information and the avoidance of conflicts of interest." *Mertens*, 508 U.S. at 251–52, 113 S.Ct. 2063 (citation omitted). The ERISA fiduciary duties are drawn from the common law of trusts, which "often will inform, but will not necessarily determine the outcome of" interpretations of ERISA's fiduciary duties. *Varity Corp.*, 516 U.S. at 497, 116 S.Ct. 1065. "In supervising pension assets, plan trustees have fiduciary obligations that have been described as the highest known to the law." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir.2001) (citation omitted).

The statutory definition of a fiduciary refers to the functions of "management or disposition" of assets and "administration" of a plan. *See* 29 U.S.C. § 1002(21)(A). The "management or disposition" language in ERISA found in 29 U.S.C. § 1002(21)(A)(i) "refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Harris Trust & Savings Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir.2002) (citation omitted). An ERISA fiduciary must "conduct a careful and impartial investigation" of the merits and appropriate structure of a plan investment. *Flanigan*, 242 F.3d at 86 (citation omitted).

"The ordinary trust law understanding of fiduciary administration of a trust is to perform the duties imposed, or exercise the powers conferred, by trust documents." *Varity Corp.*, 516 U.S. at 502, 116 S.Ct. 1065. "[I]t also includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan." *Id.* at 504, 116 S.Ct. 1065 (citation omitted).

Section 404(a) of ERISA holds fiduciaries to the "prudent man" standard:

(1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries . . .

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan.

29 U.S.C. §§ 1104(a).

■■■ ERISA fiduciaries are obligated "to ensure that fund assets are held and administered for the sole and exclusive benefit of plan participants." *O'Neil v. Retirement Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 61 (2d Cir.1994). When acting as an ERISA fiduciary, a person must manage and dispose of plan assets with "an eye single" to the interests of plan beneficiaries and participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.1982).

■■■ In the instant case, the Court finds that the members of both the Benefits Committee and the Investment Committee

exercised discretionary authority in dealing with the Plan. Indeed, had the Investment Committee recommended removing Williams from the list of available investment options, based upon its alleged knowledge that Williams stock was wrongfully inflated, the damage alleged here would not have occurred. This power to prevent damage establishes that the Investment Committee's authority was sufficient to form the basis for fiduciary responsibility in this case.[9]

■■■ The Court further finds, that, with respect to members of both the Benefits Committee and the Investment Committee, the allegations in the Complaint, accepted as true for purposes of this motion, are sufficient to make out a claim for breach of fiduciary duty and therefore to overcome a motion to dismiss. According to the Complaint, the Committee Defendants "knew or should have known" that, for a variety of reasons, Williams stock was significantly and wrongfully inflated in price. Notwithstanding this awareness, these Defendants allegedly continued to identify Williams' stock as a viable investment option and to use such stock to satisfy Williams' obligations to contribute to the accounts of Plan participants.

In the Complaint, Plaintiffs separated the alleged breaches of the Committee Defendants into three distinct duties: a duty to disclose; a duty to eliminate inappropriate investment options; and a duty to

---

9. As described above, Article IX of the Plan sets forth the duties of the Investment Committee as including:

(1) recommending to the Benefits Committee investment funds and investment managers;

(2) monitoring the performance of such investment funds and investment managers;

(3) implementing any investment objectives or guidelines which may be established by the Benefits Committee;

(4) appointing such accountants, counsel, specialists, and other persons as it deems necessary or desirable in connection with its duties under the Plan; and

(5) such other duties, authority and responsibility as may be delegated by the Benefits Committee.

avoid conflict of interest. The Court finds that such a parsing of the alleged actions by the Committee Defendants is not useful at this stage of the litigation. The fundamental question before the Court is whether the allegations in the Complaint, accepted as true, make out a claim for a breach of fiduciary duty. The Court finds that they do.

Under the Plan, the Investment Committee had the discretion to recommend investment options to the Benefits Committee and the Benefits Committee had the discretion to delete or establish an Investment Fund. The Plan did not require that Williams stock be offered as an investment option. To the extent, therefore, that any Plan fiduciary had a duty to decide or present its views on the wisdom of investment options, it would have been a breach of that duty to fail to address the need to eliminate, or at least to consider eliminating, Williams stock as one of the investment alternatives. *See In re World-Com, Inc. ERISA Lit.,* 263 F.Supp.2d 745 at 763–64 (S.D.N.Y.2003).

The Court finds that the duty to disclose, duty to eliminate inappropriate investment options, and duty to avoid a conflict of interest are in effect different aspects of a single fiduciary duty. The Committee Defendants were charged with the fiduciary responsibility to tend to the Plan's investments. This duty encompassed a duty to provide useful and accurate information to Plan participants, to identify sound investment options. To describe accurately those options, and to do so with the best interests of the Plan participants in mind, without regard for any personal interest, financial or otherwise.

In this respect, the Court finds that the analysis of the court in *WorldCom* is per-suasive when applied to the facts here. While that court addressed each alleged claim for relief separately, the ultimate conclusion was that if a person fails to perform his or her fiduciary duty with respect to the financial interests of Plan participants, a motion to dismiss cannot be sustained. Applying *WorldCom* to the instant case, the Court hereby denies the motion to dismiss of the Committee Defendants.

In sum, the Motion of Defendant The Williams Companies, Inc. and Director Defendants Pursuant to Fed.R.Civ.P. 12(b)(6) to Dismiss the Amended Consolidated Complaint for Failure to State a Claim Under ERISA (Docket No. 80) is hereby granted and Defendant Members of the Investment and Benefits Committee of the Williams Companies Motion to Dismiss Pursuant to Rule 12(b)(6) (Docket No. 76) is hereby denied.

IT IS SO ORDERED.