16-723-cv
*Morrone v. The Pension Fund of Local No. One, I.A.T.S.E.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————

August Term 2016

(Argued:  February 21, 2017     Decided:  August 14, 2017)

Docket No. 16-723-cv

————————————

VINCENT MORRONE,

*Plaintiff-Appellant,*

*v.*

THE PENSION FUND OF LOCAL NO. ONE, I.A.T.S.E.,

*Defendant-Appellee.*[*]

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————

Before:

KEARSE, HALL, AND CHIN, *Circuit Judges.*

————————————

---

[*]     The Clerk of Court is respectfully directed to amend the official caption to conform to the above.

Appeal from a judgment of the United States District Court for the Southern District of New York (Crotty, *J.*), entered pursuant to an opinion and order granting summary judgment dismissing plaintiff-appellant's claim that an amendment to a pension plan violated the anti-cutback provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*

AFFIRMED.

---

ROBERT L. LIEBROSS, Law Office of Robert L. Liebross, New York, New York (Edgar Pauk, Law Office of Edgar Pauk, Brooklyn, New York, *on the brief*), *for Plaintiff-Appellant*.

FRANKLIN K. MOSS (Denis P. Duffey Jr., Nicholas J. Johnson, *on the brief*), Spivak Lipton LLP, New York, New York, *for Defendant-Appellee*.

---

CHIN, *Circuit Judge*:

Plaintiff-appellant Vincent Morrone appeals from a judgment of the United States District Court for the Southern District of New York (Crotty, *J.*), dismissing his claim that an amendment to a pension plan offered by defendant-appellee the Pension Fund of Local No. One, I.A.T.S.E. (the "Pension Fund"), violated the anti-cutback provisions of the Employee Retirement Income Security

2

Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). We conclude that the amendment did not violate ERISA's anti-cutback rule, and we therefore affirm.

*BACKGROUND*

The facts are largely undisputed and are summarized here in the light most favorable to Morrone.

Morrone is a stagehand and a member of Local One of the International Alliance of Theatrical Stage Employees (the "Union"). He participates in a "defined benefit plan" (the "Plan"), *see* 29 U.S.C. § 1002(35), offered by the Pension Fund and is thus a "participant" in the parlance of ERISA, *see* 29 U.S.C. § 1002(7). From 1970 until 1996, Morrone earned benefits under the Plan; in 1997, he stopped working Union jobs and therefore stopped earning benefits; and in 2012, he resumed earning benefits when he returned to Union work. The principal question presented is whether a 1999 amendment to the Plan violated ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), which prohibits a pension fund from reducing or eliminating certain earned benefits.

Among other benefits, the Plan provides participants with a "Normal Pension" -- a monthly benefit, payable beginning at age sixty-five. The Normal Pension is based on two related concepts: pension credits and accrual

3

rates. Under the Plan, a participant accrues a "pension credit" for each calendar year in which he earns a minimum threshold amount of income from "Covered Employment," *i.e.*, qualifying work for an employer who is covered by the Union's collective bargaining agreements and who contributes to the Plan. [1] The Plan's Board of Trustees (the "Board") sets an "accrual rate" for each pension credit, expressed in terms of dollars per month. Not all pension credits are assigned the same accrual rate. Typically, the Board sets accrual rates for pension credits earned in more recent years higher than those earned in earlier years. Furthermore, when the Plan's investments perform well the Board occasionally exercises its discretion to raise retroactively the accrual rates for past years of pension credit. The monthly amount of a participant's Normal Pension is the sum of the products of each pension credit and its corresponding accrual rate.

To illustrate, take a hypothetical case where a participant earned pension credits from 1988 until 2013 and then retired. Under the most recent

---

[1] The threshold amounts for the relevant years (in parentheses) are as follows: $4,000 (1961 through 1977), $6,000 (1978 through 1981), $9,000 (1982 through 1984), $12,000 (1985), $15,000 (1986 through 1992), $18,000 (1993 through 1994), $20,000 (1995 through 2001), $25,000 (2002 through 2004), $30,000 (2005), and $35,000 (2006 and later).

version of the Plan, pension credits earned from 1961 to 1990 have an accrual rate of $75 per month and pension credits earned from 1991 to 2014 have an accrual rate of $100 per month. Accordingly, upon retirement, such a hypothetical participant's monthly benefit would be $2,525 -- comprised of three pension credits (for Covered Employment from 1988 to 1990) at $75 per month plus twenty-three pension credits (for Covered Employment from 1991 to and including 2013) at $100 per month.

The example presumes that the participant is entitled to *current* accrual rates for all of the pension credits that he earned from 1988 to 2013. This is because in the hypothetical the participant left Covered Employment just once (upon retirement) and, under the terms of the Plan, unless an exception applies, a participant is entitled to the accrual rates "in effect at the time [he] ultimately separates from Covered Employment." J. App. 413. Morrone calls this feature of the Plan a "living pension." Appellant's Br. at 4.

Of course, stagehands like Morrone often leave and then later return to Covered Employment. This practice led to the possibility that a participant could leave Covered Employment, wait until the Board retroactively increased accrual rates, and then return to Covered Employment for just a year to qualify

5

for the higher rates. And so the Plan included rules governing how a participant could bridge a hiatus in Covered Employment and reactivate his living pension. The crux of the parties' dispute here is whether Morrone may do so under the rule in effect when he first left Covered Employment in 1996 or whether he must satisfy a stricter rule under a 1999 amendment to the Plan. The two rules are discussed, in turn.

Before 1994, the Plan contained the so-called "Parity Rule." That rule provided as follows:

> If a Participant does not earn [pension credit] based upon Covered Employment in two or more consecutive calendar years (the "hiatus period") and thereafter retires without having resumed work in Covered Employment and earning at least as many years of [pension credit] after such resumption as the number of consecutive years in such hiatus period, the amount of benefit to which such Participant will be entitled will be based upon the monthly benefit accrual rate in force immediately prior to the start of such hiatus period but subject to the minimum pension benefit amount in force on the effective date of the award.

J. App. 285. Simply put, under the Parity Rule a worker with a break in Covered Employment of two or more years in length could bridge that gap and reactivate his living pension as to pension credits earned before the break by working in Covered Employment for at least as many years after the break as the length of

6

the break itself.  For example, a worker who takes a three-year hiatus could reactivate the living pension by returning to Covered Employment for three years.  A worker who, like Morrone, takes a fifteen-year hiatus would have to return to Covered Employment for fifteen years to reactivate the living pension.

In 1994, the Plan was amended to include the so-called "Five Year Rule."  That rule provided as follows:

> A Participant who returns to Covered Employment [after a hiatus] and earns at least five consecutive years of [pension credit] shall be entitled to a pension amount determined under the terms of the Plan and benefit levels in effect at the time the Participant ultimately separates from Covered Employment.

J. App. 413.  Under the Five Year Rule, a worker who takes a three-year hiatus must return to Covered Employment for five years to reactivate the living pension for pension credits earned pre-hiatus.  Likewise, a worker who, like Morrone, takes a fifteen-year hiatus must return to Covered Employment for just five years to do so (as opposed to fifteen years under the Parity Rule).

As noted, Morrone accrued pension credits under the Plan from 1970 until 1996 and then went on a fifteen-year hiatus.  When Morrone left Covered Employment in 1996, the operative version of the Plan contained the Five Year Rule; the accrual rate for the pension credits earned from 1970 to 1990

7

was $50 per month; and the accrual rate for the pension credits earned from 1991 to 1996 was $70 per month. By amendment dated January 1, 1999 (the "1999 Amendment"), the Plan removed the Five Year Rule and reinstated the Parity Rule.

Morrone returned to Covered Employment in 2012, and, by then, the Board had raised accrual rates for pension credits earned from 1970 to 1990 to $75 per month and for pension credits earned since 1990 to $100 per month. On January 14, 2013, Morrone wrote the Plan director to request an estimate of the monthly benefits he would receive should he retire in 2017. After a protracted back and forth with the director not relevant to this appeal, the estimate Morrone received applied the Parity Rule: Pension credits that he earned from 1970 to 1990 were assigned a $50 per month accrual rate (the rate in effect in 1996, when he began his hiatus); those earned from 1991 to 1996 were valued at $70 per month (also the 1996 rate); and those earned since 2012 were valued at $100 per month (the current rate), for a total monthly benefit of $1,770.[2] The director determined that because Morrone had taken a fifteen-year hiatus and would have returned to Covered Employment for only six years as of 2017, he was not

---

[2]     The estimate presumed Morrone would earn pension credits through the year 2014, rather than 2017.

8

entitled to the current accrual rate for the pension credits he earned before his hiatus.

Morrone filed an appeal with the Board, seeking current accrual rates for all of his pension credits and not just those he earned since returning to Covered Employment in 2012. The difference is indeed material. Applying the Five Year Rule would give Morrone an extra $705 per month or $8,460 per year above the estimate provided by the Plan director. The Board denied Morrone's appeal and his subsequent request to reconsider.

On October 14, 2014, having exhausted his administrative remedies, Morrone filed this action below against the Pension Fund, seeking declaratory relief to clarify his rights to future pension benefits under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B) (providing that a civil action may be brought by a participant "to clarify his rights to future benefits under the terms of the plan"). Specifically, Morrone alleged that the 1999 Amendment reinstating the Parity Rule was an illegal reduction of accrued benefits or retirement-type subsidies under ERISA's "anti-cutback rule." 29 U.S.C. § 1054(g).

The parties filed cross-motions for summary judgment on April 24, 2015. On February 10, 2016, the district court granted the Pension Fund's motion

9

and denied Morrone's motion.  It concluded that "the 1999 [A]mendment did not reduce 'a retirement-type subsidy . . . with respect to benefits attributable to service before the amendment,'" as prohibited by 29 U.S.C. § 1054(g), "because the benefits Morrone contests are attributable to service *after* the amendment." *Morrone v. Pension Fund of Local No. 1, I.A.T.S.E.*, No. 14 Civ. 8197, 2016 WL 554844, at *2 (S.D.N.Y. Feb. 10, 2016).  Moreover, the district court held that the 1999 Amendment also did not decrease an "accrued benefit" because it merely "modified the conditions under which Morrone could accrue additional benefits in the future; it did not modify the benefits Morrone had already accrued in the past."  *Id*.  Accordingly, the district court entered judgment in favor of the Pension Fund.

This appeal followed.

## DISCUSSION

The questions presented are whether, by removing the Five Year Rule and reinstating the Parity Rule, the 1999 Amendment impermissibly reduced (1) an "accrued benefit" or (2) a "retirement-type subsidy," in violation of ERISA's anti-cutback provision.  29 U.S.C. § 1054(g).

10

## I. Applicable Law

### A. Standard of Review

We review *de novo* the district court's summary judgment ruling, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in [his] favor." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *accord Fallin v. Commonwealth Indus., Inc.*, 695 F.3d 512, 516 (6th Cir. 2012) (reviewing *de novo* the district court's entry of summary judgment on grounds that a plan amendment did not violate ERISA's anti-cutback rule). A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. ERISA's Anti-Cutback Rule

ERISA was enacted "to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Its purpose is to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement -- and if he has fulfilled whatever conditions are required to obtain a vested benefit -- he actually will receive it." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375

11

(1980). The statute's so-called "anti-cutback rule" is "crucial" to this purpose.

*Cen. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 744 (2004). In fact, Congress amended the rule with the Retirement Equity Act of 1984 to clarify that it protects accrued benefits, as well as early retirement benefits, retirement-type subsidies, and optional forms of benefits. *See id.* at 744; 29 U.S.C. § 1054(g)(1)-(2). As amended, the anti-cutback rule provides as follows:

> (g) Decrease of accrued benefits through amendment of plan
>> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan [except in certain circumstances not present here].
>> (2) For purposes of paragraph (1), a plan amendment which has the effect of --
>>> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
>>> (B) eliminating an optional form of benefit,
>> with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.

29 U.S.C. § 1054(g)(1)-(2). Examining the statute's text reveals that the anti-cutback rule has two important features.

First, the rule principally protects those benefits that a participant has earned, rather than those that he might earn in the future. *See Heinz*, 541 U.S. at 747 ("So far as the IRS regulations [that interpret § 1054(g)] are concerned . . . the anti-cutback provision flatly prohibits plans from attaching new conditions to benefits that an employee has *already earned*." (emphasis added)). This is because, except for "the case of a retirement-type subsidy" (which we will discuss below), the plain text of the statute prohibits only an amendment which (1) decreases an "*accrued* benefit" or (2) "eliminat[es] or reduc[es] an early retirement benefit . . . or . . . an optional form of benefit . . . with respect to benefits attributable to service *before the amendment*." 29 U.S.C. § 1054(g)(1)-(2) (emphases added). Accordingly, save changes that impact retirement-type subsidies, "employers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, *future* employment." *Heinz*, 541 U.S. at 747 (emphasis added).

Second, the rule privileges substance over form. *See id.* at 744-45. Again, the plain text of the statute focuses on "the *effect* of" a plan amendment, *i.e.*, whether it decreases, eliminates, or reduces benefits or subsidies. 29 U.S.C. § 1054(g)(2) (emphasis added). This focus on the "effect" of plan amendments

13

means that a court must consider whether, "in any practical sense, [the] change of terms could [] be viewed as shrinking the value of [a participant's] pension rights and reducing his promised benefits." *Heinz*, 541 U.S. at 745. For example, in *Central Laborers' Pension Fund v. Heinz*, the Supreme Court rejected any formal distinction between, on the one hand, "placing materially greater restrictions on the receipt of [a] benefit," and on the other, "a decrease in the size of the monthly benefit payment" itself because, "as a matter of common sense, a participant's benefits cannot be understood without reference to the conditions imposed on receiving those benefits." *Id.* at 744 (alteration and internal quotation marks omitted). At bottom, "[t]he real question is whether . . . at the moment the new [amendment] is imposed, the accrued benefit [or retirement-type subsidy] becomes less valuable." *Id.* at 746.

II.    **Application**

With these principles in mind, we turn to Morrone's arguments on appeal that the 1999 Amendment violated the anti-cutback rule. We consider whether the 1999 Amendment decreased, first, Morrone's accrued benefits, and, second, a retirement-type subsidy.

14

## A.     Accrued Benefits

Morrone argues that the 1999 Amendment impermissibly reduced his accrued benefits. First, he contends that applying the Parity Rule instead of the Five Year Rule plainly decreased his accrued benefits because it reduced the accrual rates for the pension credits he earned from 1970 to 1996. Second, he avers that the "right" to reactivate the living pension feature under the Five Year Rule is *itself* a benefit that he accrued by working in Covered Employment from 1994 to 1996, when the Five Year Rule was in effect. Both of these arguments fail.

Morrone's first argument is inconsistent with the Supreme Court's instruction in *Heinz* that, "[i]n a given case," a court must evaluate the effect of a plan amendment "at the moment the new condition is imposed." 541 U.S. at 746. As noted above, Morrone accrued pension credits by earning the requisite amount of income from Covered Employment in each year from 1970 to 1996. It is therefore undisputed that, in 1999, when the Plan was amended, he was entitled to receive pension benefits based on his service from 1970 to 1996 -- those pension credits were unquestionably an "accrued" portion of Morrone's benefit. The parties dispute what accrual rates Morrone was entitled to receive for these

15

accrued pension credits.  Under Morrone's interpretation,[3] the terms of the Plan

before the 1999 Amendment provided that the "pension to which a Participant is

entitled shall be determined under the terms of the Plan and [the accrual rates] in

effect at the time the Participant separates from Covered Employment," *i.e.*, in

1996, unless he satisfies the Five Year Rule, in which case he "shall be entitled to

. . . [the accrual rates] in effect at the time [he] ultimately separates from Covered

Employment," *i.e.*, in 2017.  J. App. 413 (Article II, Section 16).

Morrone separated from Covered Employment in 1996.  In 1999,

when the Plan was amended, Morrone had neither returned to Covered

Employment, nor had he earned at least five consecutive years of pension credit

thereafter.  As a result, he was entitled to the accrual rates in effect in 1996, when

he separated from Covered Employment and began his fifteen-year hiatus.  In

other words, in 1999, even under the version of the Plan that Morrone prefers --

the one containing the Five Year Rule -- Morrone had earned only the accrual

rates in effect in 1996.  Thus, in accordance with *Heinz*, the 1999 Amendment did

not violate the anti-cutback rule because Morrone's "accrued benefit [did not]

---

[3]     The Pension Fund offers a conflicting interpretation of the preamendment version of the Plan, arguing that, even if the Five Year Rule applies, it does not benefit Morrone.  But we need not reach this argument because, as we shall see, even if Morrone's interpretation is correct, there was no reduction of his accrued benefits.

16

become[] less valuable" "at the moment the [1999 Amendment was] imposed." 541 U.S. at 746. Indeed, Morrone will receive exactly the benefits he was entitled to receive under the pre-1999 Amendment-version of the Plan, namely, the accrual rates in effect in 1996 for the pension credits he earned from 1970 to 1996.

Morrone's second argument is that the "right" to reactivate his living pension under the Five Year Rule is *itself* a benefit that he accrued by working in Covered Employment from 1994 to 1996. This argument is belied by the text of the statute. As is relevant to this appeal, ERISA provides that "[t]he term 'accrued benefit' means . . . in the case of a defined benefit plan, the individual's accrued benefit [1] determined under the plan and . . . [2] expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Morrone fails to show how his purported "right" under the Five Year Rule satisfies either prong of this definition.

As to the first prong, the Supreme Court has noted that ERISA "rather circularly defines 'accrued benefit' as 'the individual's accrued benefit determined under the plan.'" *Heinz*, 541 U.S. at 744 (quoting 29 U.S.C. § 1002(23)(A)). Faced with this circularity in *Heinz*, the Supreme Court examined the terms of the plan before it to determine if a benefit was impermissibly

17

reduced in violation of the anti-cutback rule.  *See id.* at 744-45.  Likewise, the

Sixth Circuit has "postulated that rather than give a comprehensive definition of

'accrued benefits,' Congress chose to leave the responsibility of delineating the

bounds of the term to 'the employer and the employee through the agreed-upon

*terms* of the plan document.'"  *Deschamps v. Bridgestone Ams., Inc. Salaried Emps.*

*Ret. Plan*, 840 F.3d 267, 279-80 (6th Cir. 2016) (quoting *Thornton v. Graphic*

*Commc'ns Conf. of the Int'l Bhd. of Teamsters Supplemental Ret. & Disability Fund*,

566 F.3d 597, 608 (6th Cir. 2009)).  In light of this delegation of responsibility, the

Sixth Circuit reasoned that it should "look to the terms of the Plan in ascertaining

which, if any, benefits . . . accrued prior to the [challenged] amendment."  *Id*. at

280.  Accordingly, we do the same.

Here, the version of the Plan in effect before the 1999 Amendment

does not define the term "accrued benefit."  But it does provide that the "term

'Pension Credit' shall mean the years of [pension credit] for service in Covered

Employment which are accumulated and maintained for Employees in

accordance with the provisions of Article III of this Pension Plan."  J. App. 395.

Article III, in turn, articulates the rules governing the accrual of pension credits,

vesting rights, breaks in service, and other events that impact a participant's

18

status under the Plan, including hiatuses from Covered Employment. Moreover, as noted previously, the Plan states that a participant's monthly Normal Pension benefit is the sum of the products of each pension credit and its corresponding accrual rate. None of these provisions, however, supports Morrone's contention that the ability to qualify for current accrual rates under the Five Year Rule *or* the Parity Rule constitutes a "benefit" that he accrues under the Plan. Rather, we agree with the district court that the Five Year Rule and the Parity Rule are "*conditions* under which Morrone could accrue *additional* benefits in the future"; they are not "accrued benefits" themselves. *Morrone*, 2016 WL 554844, at *2.

As to the second prong, the statute defines "accrued benefit" in part as one capable of being "expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Indeed, ERISA's benefit accrual requirements provide that an "accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age." *Esden v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000) (construing 29 U.S.C. § 1054(c)(3)). Morrone has made no attempt to show that his "right" to reactivate his living pension under the Five Year Rule or the Parity Rule is capable of being valued in that way. And we are doubtful that he could

19

make such a showing, which would require speculative assumptions about, *inter alia*, the likelihood that the Board would raise accrual rates in the future, the amount of any such increase, the years of pension credit to which the increases would redound, and the likelihood that any given participant would accrue the requisite years of pension credit after his hiatus. In other words, we reject Morrone's contention "that we should take a broad view of accrued benefits that would include a *right* to have his benefit calculated as if" the Five Year Rule were still in effect. *Arndt v. Sec. Bank S.S.B. Emps.' Pension Plan*, 182 F.3d 538, 541 (7th Cir. 1999) (rejecting a similar argument with respect to disability benefits).

For these reasons, we conclude that, even if the Plan conferred on participants a "right" to reactivate the "living pension" feature after a hiatus in Covered Employment, such right does not constitute an "accrued benefit" as that term is defined in ERISA. 29 U.S.C. § 1002(23)(A). Accordingly, the 1999 Amendment did not violate § 1054(g)(1) of the anti-cutback rule.

### B. Retirement-Type Subsidy

Morrone next argues that the higher accrual rates he seeks constitute a "retirement-type subsidy" and, consequently, he should be permitted to satisfy "the preamendment conditions for the subsidy," 29 U.S.C. § 1054(g)(2), by

20

earning five pension credits under the Five Year Rule rather than the fifteen required by the Parity Rule. We are not persuaded.

The anti-cutback rule protects retirement-type subsidies "only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy." *Id.* We have read this "provision as straightforwardly applying to participants . . . who qualified for the subsidy before the [challenged] amendment or who could do so afterwards" under the terms of the plan before the amendment. *Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 77 (2d Cir. 2014). Furthermore, because "an amendment placing materially greater restrictions on the receipt of [a] benefit reduces the benefit just as surely as a decrease in the size of the monthly benefit payment," *Heinz*, 541 U.S. at 744 (internal quotation marks omitted), the Plan may not lawfully apply the Parity Rule in place of the Five Year Rule if the higher accrual rates that Morrone seeks constitute a "retirement-type subsidy," *see* 29 U.S.C. § 1054(g)(2). We conclude they do not.

ERISA does not define "retirement-type subsidy." Instead, Congress delegated authority to the Treasury Department to define the term. *See* 29 U.S.C. § 1054(g)(2) (prohibiting "a plan amendment which has the effect of . . .

21

eliminating or reducing . . . a retirement-type subsidy (*as defined in regulations*)" (emphasis added)); *Bellas v. CBS, Inc.*, 221 F.3d 517, 524 (3d Cir. 2000) ("Congress contemplated that the Treasury Department would promulgate regulations setting forth the definition of retirement-type subsidy."). The Treasury Department did not exercise that authority until 2005 when, acting through the Internal Revenue Service ("IRS"), it promulgated regulations defining "retirement-type subsidy." *See* Section 411(d)(6) Protected Benefits, 70 Fed. Reg. 47,109 (Aug. 12, 2005). By their terms, those IRS regulations apply to plan amendments adopted on or after August 12, 2005 and thus do not apply to the 1999 Amendment. *See* 26 C.F.R. § 1.411(d)–3(j) (2016). Nonetheless, both Morrone and the Pension Fund rely on the regulations as persuasive authority and therefore we consider them here. The regulations define "retirement-type subsidy" as follows:

> The term *retirement-type subsidy* means the *excess*, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later, with both such actuarial present values determined as of the date the retirement-type benefit commences. Examples of retirement-type subsidies include a subsidized early retirement benefit and a subsidized qualified joint and survivor annuity.

26 C.F.R. § 1.411(d)–3(g)(6)(iv) (first emphasis in original and second emphasis added).

A fundamental concept encompassed by this definition is that a retirement-type subsidy is an amount *in addition to* or *in excess of* a participant's normal retirement benefit. In that regard, the regulation accords with the ordinary meaning of the word "subsidy" as used in this context, *i.e.*, "a payment of an amount *in excess of* the usual charge for a service." *Webster's Third New International Dictionary of the English Language Unabridged* 2279 (1968) (emphasis added). It also comports with relevant legislative history. In describing the scope of 29 U.S.C. § 1054(g)(2), the Senate Report on the bill that would become the Retirement Equity Act of 1984 makes clear that a "benefit subsidy" is "*the excess of* the value of a benefit over the actuarial equivalent of the normal retirement benefit." S. Rep. No. 98-575, at 28 (1984) (emphasis added). Decisions of our sister circuits are also in accord. For example, the Third Circuit has "defined a retirement-type subsidy to be *the excess in value of* a benefit over the actuarial equivalent of the normal retirement benefit." *Bellas*, 221 F.3d at 525 (emphasis added). In sum, the ordinary meaning of the word "subsidy," the legislative history, existing case law, and IRS regulations lead us to conclude that

23

an essential characteristic of a retirement-type subsidy is that it is an amount in excess of a participant's normal retirement benefit. Accordingly, if the higher accrual rates that Morrone seeks are not in excess of or in addition to his normal retirement benefit, then they are not a "retirement-type subsidy" protected by § 1054(g)(2) of the anti-cutback rule.

Turning to the text of the Plan, we conclude that, even under Morrone's preferred interpretation, the higher accrual rates that he seeks would constitute his normal retirement benefit and not an amount in excess of it. Therefore, those higher accrual rates are not a retirement-type subsidy. To recap, Article II, Section 16, entitled "Application of Benefit Increases," provides that "[t]he pension to which a Participant is entitled shall be determined under the terms of the Plan and benefit levels in effect at the time the Participant separates from Covered Employment." J. App. 413. Article III, Section 11, entitled "Protracted Absence of Participant from Covered Employment," contains the Parity Rule: A worker with a hiatus in Covered Employment of two or more years in length is entitled to "the monthly benefit accrual rate in force immediately prior to the start of" the hiatus, unless he returns to Covered Employment for at least as many years as the length of the hiatus itself. J. App.

24

431. Morrone argues, however, that the Five Year Rule is a "preamendment condition" to his receipt of the higher accrual rates in effect when he plans to retire in 2017, and thus he should be permitted to qualify for those higher rates under the Five Year Rule in accordance with 29 U.S.C. § 1054(g)(2).

Morrone is correct that the accrual rates he seeks via application of the Five Year Rule are greater than those he is entitled to receive under the Parity Rule. But those higher accrual rates are not an amount *in excess of* his normal retirement benefit. Under the terms of the Plan, they *would constitute* his normal retirement benefit if he satisfied the Plan's conditions for receiving them. That is because, regardless of whether the Five Year Rule or the Parity Rule applies, the Plan states that "the monthly amount of [Morrone's] Normal Pension will be determined by" calculating the sum of the products of each pension credit he earned and its corresponding accrual rate, as determined in accordance with the text of the Plan. J. App. 401; *see also* 29 U.S.C. § 1002(22) (defining "normal retirement benefit," in relevant part, as "the benefit under the plan commencing at normal retirement age"). Accordingly, the 1999 Amendment did not place greater restrictions on the receipt of a retirement-type subsidy. Instead, it merely changed the conditions under which Morrone could earn a larger normal

retirement benefit in the future. Thus, the 1999 Amendment is not prohibited by § 1054(g)(2) of the anti-cutback rule because it does not reduce a retirement-type subsidy.

\* \* \*

Congress enacted robust protections for pensioners by expanding the anti-cutback rule in 1984. The rule specifically protects pensioners' accrued benefits, early retirement benefits, retirement-type subsidies, and optional forms of benefits. But, contrary to Morrone's arguments on appeal, the anti-cutback rule does not command that a pensioner's benefits be determined under the version of the plan that is most generous to him. Employers remain "perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment." *Heinz*, 541 U.S. at 747. That is exactly what happened in this case.

## *CONCLUSION*

To summarize, we conclude that the 1999 Amendment did not decrease Morrone's accrued benefits. Moreover, the higher benefit accrual rates that Morrone demands are not a "retirement-type subsidy" -- rather, they would constitute his normal retirement benefit if he satisfied the conditions to receiving

them, namely, the Parity Rule.  Accordingly, we conclude that the 1999

Amendment did not violate ERISA's anti-cutback rule, 29 U.S.C. § 1054(g).  We

have considered Morrone's remaining arguments and conclude they are without

merit.

We therefore **AFFIRM**.